681 F.2d 306
 3 Employee Benefits Ca 1769
 Robert DENNARD, Plaintiff-Appellant Cross-Appellee,
v.
The RICHARDS GROUP, INC., its Employee Profit-Sharing Plan,
and Stanford H.Richards, Trustee and
Administrative Retirement Committee
Member,Defendants-Appellees
Cross-Appellants.
 No. 81-1181
 
 Summary Calendar.
 United States Court of Appeals,
Fifth Circuit.
 July 26, 1982.
 Vial, Hamilton, Koch, Tubb, Knox & Stradley, Byron L. Falk, James C. Ash, Jr., Dallas, Tex., for plaintiff-appellant cross-appellee.
 Durant, Mankoff, Davis, Wolens & Francis, Bruce A. Budner, Dallas, Tex., for defendants-appellees cross-appellants.
 Appeals from the United States District Court for the Northern District of Texas.
 Before BROWN, POLITZ and WILLIAMS, Circuit Judges.
 JOHN R. BROWN, Circuit Judge:
 
 
 1
 This action arises from the denial of certain pension benefits under The Richards Group, Inc. Employees' Profit-Sharing Plan (Plan). On cross motions for summary judgment, the District Court granted summary judgment in favor of the Plan but denied the Plan's counterclaim for attorney's fees. The court, after reviewing both parties' interpretation of the Plan, determined that the interpretation of the Plan's Administrative Retirement Committee (Committee) was not arbitrary and capricious and thus, under the standard of review applied, upheld its interpretation. To reach this conclusion the court focused on the fact that the Plan had been uniformly construed in other cases of similarly situated employees and the Committee interpretation could be "fairly implied" and was "rationally related to the purposes of the Plan and performs a necessary function in the implementation of the Plan." For the reasons explained in much greater detail below, we are not convinced that the District Court properly considered what factors would indicate that the Committee had acted arbitrarily and capriciously or that it correctly interpreted the Plan as a whole. Where, as here, one party is arguing that the Plan's provisions are not ambiguous and that the Committee has applied the provisions of the Plan in direct contradiction to its terms, the District Court should have determined first the correct interpretation of the Plan. From that finding, the court should have proceeded to determine if the Committee, even if incorrect in its interpretation, acted arbitrarily or capriciously as that term has been used in other ERISA cases. Specifically, the Committee's actions should be viewed in light of relevant Internal Revenue Service regulations, not mentioned by the District Court, internal plan consistency, and the separate and distinct nature of vesting, allocation, gains, and participation. Given the dominant role of the major shareholder of the Company as Chairman of the Board of the Company, Chairman of the Committee, and Trustee of the Plan, along with other factors, many raising factual issues which were in the control of the Company and the Plan and of which discovery had not been completed, we find that the participant's challenge to the good faith of the Committee's interpretation should not have been disposed of by summary judgment at that point without the employee being allowed an opportunity to prove bad faith on the part of the Committee. We therefore reverse and remand for action in conformity with our opinion.
 
 I. The Facts
 
 2
 Robert Dennard worked for The Richards Group from February 1966 until September 1977, except for a three month break during 1972. As an employee of The Richards Group, Dennard was a participant in the Company's profit-sharing plan. The Plan, first adopted in April of 1967, was restated in 1976 to comply with the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 et seq., the federal legislation regulating private employee benefit plans.[1] Dennard's claims result from a difference in opinion over the amount of benefits to which he is entitled under the Plan, a difference of approximately $7,936.19, an amount attributable to investment earnings on his account in the Plan.
 
 II. ERISA and the Plan
 
 3
 ERISA, enacted in 1974 to protect and regulate private employee benefit plans,[2] establishes for plans which seek tax-exempt status certain minimum requirements for participation and benefit calculation, as well as reporting and disclosure standards. The effect of a "qualified" plan meeting ERISA standards is to allow the employer to deduct contributions and provide the participants with tax deferral of the benefits until receipt. Because ERISA mandated massive overhaul of employee benefit plans, many plans were restated in 1976 and thereafter as Department of Labor and Internal Revenue Service regulations became finalized. The Richards Group Plan was one of those pre-ERISA plans restated to comply with the new statutory demands.
 
 A. Who
 
 4
 The Richards Group Plan is a profit-sharing plan, whereby the employer contributes a specified percentage of profits annually to a trust fund maintained for the benefit of Participants. An employee is generally eligible to become a Participant upon completion of 1,000 "hours of service", or "one year of service", within a consecutive 12-month period commencing on the date of employment. Once eligible, an employee becomes a Participant on the May 1 or November 1 which coincides with or next follows the date of completion of the 1,000 hours of service. This accords with ERISA standards which establish maximum periods for eligibility and entry into a plan. As a Participant, an employee is eligible to receive an allocation, that is a portion, of the employer's contribution made each Plan Year. The Plan Year, in this case, May 1 through April 30, is the basic computation period, used when participation has commenced, to measure service for purposes of receiving a portion of the employer's contribution and to determine vesting, as described below.
 
 B. How Much
 
 5
 Each Plan Year the Company contributes to a trust fund. The contribution is then allocated to different Participants on the basis of their relative compensation for that Plan Year. ERISA requires that separate accounts for purposes of record-keeping be maintained for each Participant. Under the Richards Plan, each participant receives one unit for each $100 of compensation received during the Plan Year. The total contribution by the Company is then allocated on the basis that a Participant's units for such year bears to the total units of all Participants for the year. For example, with a Company contribution of $10,000 and a total payroll for Participants of $100,000 (or 1,000 units), a Participant earning $20,000 (or 200 units) would receive 1/5 (20,000/100,000) or $2000. A Participant earning $40,000 (400 units) would receive $4000 or 2/5 of the total contribution. This amount would then be credited to the Participant's account.
 
 
 6
 A Participant is not necessarily entitled to the full amount in his account immediately upon the allocation. Each Plan Year that a Participant works 1,000 or more hours of service with the Company he receives credit for One Year of Service. His vested interest, that is the portion of his account which is nonforfeitable, increases as he receives credit for Years of Service. Vesting, or nonforfeitability, begins with two Years of Service, at which point a Participant is entitled to 20% of his employer account balance. The vested percentage increases 10% per year of service after that point until 10 years are completed at which point the Participant is 100% or fully vested in his account balance and any further contributions made by the employer. A Participant who leaves the employment of the Company prior to full vesting (100%) forfeits the unvested portion of his account once he has incurred a one year Break in Service, that is a Plan Year during which an employee completes less than 501 hours of Service. The forfeitures are then reallocated to the remaining Participants at the end of the Plan Year in which the Break in Service is incurred in the same manner that the employer contribution is allocated. Thus, a Participant who resigns after three years of service and 30% vesting will, once a Break has occurred, forfeit 70% of his account.
 
 C. When
 
 7
 Although a participant has a vested interest in the Plan, he is not entitled to receive any benefits until a later date. Receipt of benefits may be deferred generally until retirement age, unless the Committee administering the plan consents to an earlier pay-out.[3] Benefits, when distributed, may be paid in lump sum, periodic payments, or by the purchase of an annuity. When distributed in periodic payments, a Participant's account is segregated from the rest of the trust fund and the earnings on the segregated amount inure only to that Participant, rather than the Participant sharing proportionally in any gains or losses of the trust fund.
 
 D. Gains and Losses
 
 8
 Besides employer contributions and forfeitures, there is a third factor involved in determining the amount in a Participant's account-the investment gains or losses of the entire trust fund.[4] It is the allocation of these gains or losses which forms the basis of this lawsuit. The trust fund is valued annually and then gains or losses are allocated to the accounts of "each Participant whose Service was not terminated ... during such Plan Year and to the account of each Former Participant whose Account had not, as of the first day of such Plan Year, been segregated (due to selection of periodic payment method)" on the basis of relative account balances. Thus, if the trust fund appreciates in value $20,000 in a Plan Year, and the total fund prior to this increase was $200,000, a Participant with an account balance of $40,000 or 1/5 of the trust fund (40,000/200,000) would receive 1/5 of the $20,000 gain or $4000. If the trust fund had decreased $20,000, the loss would be allocated in the same manner, reducing our hypothetical Participant's account to $36,000.
 
 III. The Dispute
 
 9
 At the time that Dennard voluntarily resigned from The Richards Group on September 16, 1977 he was 100% vested in the balance of his employer account and did not incur a one year Break in Service (a Plan Year with less than 501 hours) during the Plan Year May 1, 1977-April 30, 1978. Dennard received an allocation of employer contributions, forfeitures, and investment gains or losses to the trust fund for the Plan Year May 1, 1977-April 30, 1978, at which time his account balance was $57,200.01. No distribution of benefits was made until May 30, 1979, one month following the close of the Plan Year May 1, 1978-April 30, 1979, the Plan Year in which he incurred a one year Break in Service. No allocation of employer contributions, forfeitures or investment gains or losses was made to Dennard's account for the Plan Year May 1, 1978-April 30, 1979. Dennard agrees that he was not entitled to a share of the Company's contribution and forfeitures for that Plan Year-the only amount in dispute is $7,936.19, Dennard's share of the investment gains from the May 1, 1978-April 30, 1979 Plan Year. Allocation of investment earnings is basically the equivalent to receiving interest on a bank account, but since the trust fund, or bank account so to speak, consists of accounts for several persons, the interest is divided among them on the basis of account balance ratio.
 
 
 10
 In accordance with the Plan, Dennard made written demand for this additional amount, $7,936.19, which the Plan's Committee denied in a letter dated October 2, 1979. Dennard appealed the Committee's denial to the Board of Directors of The Richards Group which, after a hearing, affirmed the denial of the claim. After having exhausted these administrative remedies, Dennard filed suit under Section 502(a)(1)(B) of ERISA against The Richards Group, its profit-sharing plan, and Stanford H. Richards in his capacity as Trustee for the Plan and member of the Committee. Section 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1), provides jurisdiction in both state and federal courts.
 
 
 11
 At issue in this claim is the interpretation of certain specific Plan provisions and the interrelation of participation, vesting, and allocation. Much of the dispute centers on the definitions of Former Participant[5] and Participant[6], and how those terms correspond to the provisions governing allocation of earnings (investment gains)[7] and determination of vested interest.[8] The Plan establishes basically two classes of participants-active participants (Participant as defined in § 2.24, see note 6, supra), who may be either current employees or terminated employees and for whom the employer has made or is obligated to make a contribution (that is, a share of the Company's profits, unrelated to any gains on the investment of the trust fund); and inactive participants (Former Participant as defined in § 2.16, see note 5, supra) who have terminated their Service[9] (performance of duties for the employer) but still have a vested interest under the Plan, that is, they have not received a distribution in full. As the Plan is written, Participants still continue to receive allocations of the Employer's contribution; Former Participants do not receive these allocations but do share in the investment gains of the trust fund.
 
 
 12
 As written, the Plan appears to distinguish a Participant from a Former Participant by the entitlement of the Participant to a share of the Company's contribution, since a former employee can be by definition either a Participant or Former Participant. For purposes of allocating the employer's contribution, the Plan provides a portion to each person who has worked and not incurred a One Year Break in Service.[10] Investment earnings-which are separate and distinct from employer contributions, being based on account balances, not on actual employment which is necessary for employer contributions which are calculated on the basis of compensation earned as units-are allocated to those Participants who have not terminated and those Former Participants (terminated employees) who still have an account balance. Thus the only person who would not receive an allocation of gains is one who has terminated his employment relationship, received his account balance, and is therefore no longer a Participant or Former Participant as those terms are defined.
 
 
 13
 Dennard's contention can be stated simply. Section 9.02 of the Plan provides that his vested interest is the amount in his employer account as of the last day of the preceding Plan Year in which he did not incur a Break in Service, here the Plan Year May 1, 1977-April 30, 1978, subject to Section 5.03 hereof, multiplied by his vested percentage, here 100%. Section 5.03 (see note 7 supra) provides for the allocation of net earnings and adjustments to Former Participants, the category which Dennard would fit into for the Plan Year May 1, 1978-April 30, 1979, since he had a vested interest but had not been paid in full. He was not a Participant for that year since the Company was not obligated to make a contribution, as distinct from an allocation of earnings, to the Plan.
 
 
 14
 The Richards Group's position turns on its determination that "termination", not defined in the Plan, is synonymous with a "One Year Break in Service" (§ 2.23, see note 10 supra) for purposes of allocation and vesting and in the definition of Former Participant (§ 2.16, see note 5 supra). Under this view, a Former Participant includes only a former employee who has already incurred a One Year Break in Service. An employee who resigns or is fired during a Plan Year, but who does not incur a One Year Break in Service during that Plan Year, remains a Participant for the Plan Year and receives for that year allocations of employer contributions and forfeitures, as well as earnings. At the end of the next Plan Year, if the employee has not returned to work, he incurs a One Year Break in Service and is "terminated" within the meaning of the Plan. His vested interest is then fixed on the basis of his account balance on the last day of the previous Plan Year, a result reached by a reading of § 9.02, (see note 8 supra), which provision governs the determination of the percentage of an account balance to which a Participant is entitled.
 
 
 15
 Under this interpretation, Dennard was a Participant for the Plan Year May 1, 1977-April 30, 1978 who incurred a One Year Break in Service at the end of the Plan Year May 1, 1978-April 30, 1979. His Vested Interest became fixed at the amount of the account as of the last day of the preceding Plan Year in which he did not incur a break, April 30, 1978. The parenthetical phrase in section 9.02, "(subject to Section 5.03 hereof)", is not explicated by the Company.
 
 IV. Standard of Review
 
 16
 The District Court in the first instance, and this Court on appeal, in reviewing the actions of administrators of an employee benefit plan, utilize an "arbitrary and capricious" standard of review. Paris v. Profit Sharing Plan for Employees of Howard B. Wolf, Inc., 637 F.2d 357, 362 (5th Cir.), cert. denied, --- U.S. ----, 102 S.Ct. 140, 70 L.Ed.2d 117 (1981); Bayles v. Central States, Southeast and Southwest Areas Pension Fund, 602 F.2d 97, 99 & 100 n.3 (5th Cir. 1979). "According to the clear weight of federal authority, the actions of the trustees in the administration of the pension plan must be sustained as a matter of law unless plaintiff can prove such activities have been arbitrary or capricious." Bayles, supra. This standard, traditionally used for review of trusts, has been applied by several other circuits.[11] Such a standard prevents excessive judicial intervention in trust operations. Rehmar v. Smith, 555 F.2d 1362, 1371 (9th Cir. 1976).
 
 
 17
 Federal courts have applied the arbitrary and capricious standard both to ambiguous and unambiguous terms. A rational and reasonable interpretation of a plan may still be arbitrary and capricious if contrary to the plain meaning of the plan. "Where the trustees impose a standard not required by the pension plan itself, this court has stated that such action 'would result in an unwarranted and arbitrary construction of the Plan.' " Morgan v. Mullins, 643 F.2d at 1321 (8th Cir. 1981) (quoting Maness v. Williams, 513 F.2d at 1267). See Richardson v. Central States, Southeast & Southwest Areas Pension Fund, 645 F.2d 660, 663 n.3 (8th Cir. 1981). Another Eighth Circuit opinion, Bueneman v. Central States, Southeast & Southwest Areas Pension Fund, supra, a case also relied on in Morgan, supra, was noted with approval in our decisions in Bayles, supra, and Howard Wolf, supra. The Seventh Circuit, in applying the arbitrary and capricious yardstick, has stated that this standard apparently originated with the District of Columbia Circuit's formulation of "whether the Trustees have acted arbitrarily, capriciously, or in bad faith; that is, is the decision of the Trustees supported by substantial evidence or have they made an erroneous decision on a question of law." Wardle v. Central States, Southeast & Southwest Areas Pension Fund, 627 F.2d at 823.
 
 
 18
 In Bayles, we indicated certain factors to be considered in applying the arbitrary and capricious standard: (1) uniformity of construction; (2) "fair reading" and reasonableness of that reading; and (3) unanticipated costs.[12] We there determined that the pensioner's interpretation of the plan would render another section of the plan meaningless and that "(a) fair reading of the provision" revealed that the language's purpose was that maintained by the trustees. Thus we were in effect taking into account the District Court's determination of the meaning as part of the review for arbitrary and capricious action. Along with the determination of the "legally" correct meaning of the plan provision in question, we also view as probative of the good faith of a trustee or administrator the following factors: (1) internal consistency of a plan under the interpretation given by the administrators or trustees; (2) any relevant regulations formulated by the appropriate administrative agencies, here the IRS and Department of Labor; and (3) factual background of the determination by a plan and inferences of lack of good faith, if any. The fact that a trustee's interpretation is not the correct one as determined by a District Court does not establish in itself arbitrary and capricious action, but is a factor in that determination. When the trustee's interpretation of a plan is in direct conflict with express language in a plan, this action is a very strong indication of arbitrary and capricious behavior.
 
 
 19
 The District Court's opinion in this case failed to determine what the "legally" correct interpretation of the Plan provisions should be. While we would not necessarily remand on the basis of this omission, we are not convinced that the District Court considered all factors possibly indicating arbitrary and capricious action by the Committee. Given the posture of this case, decided on summary judgment, we cannot say that when viewed in the light most favorable to the party opposed to the motion, here Dennard, there was not an issue of fact. That issue would depend on the actions of the Committee in light of the determination of the legal issue of the correct interpretation of the Plan. The District Court, rather than reach that legal issue, stated that "(t)he Court cannot say that Dennard's interpretation of the Plan is wholly implausible", a statement it felt sufficient under the arbitrary and capricious standard. The District Court specifically indicated that whether the Committee's interpretation was "right" was not the standard of review.
 
 
 20
 Certainly action contrary to IRS rulings could be indicative of arbitrary and capricious action. The District Court's opinion here failed to discuss the revenue rulings mentioned below. Nor did the District Court consider all aspects of consistency of the Plan, as discussed below, but rather it focused on only those portions necessary to the Committee's thesis. The District Court appears to have put emphasis on the issue of uniformity in application, a factor probably not as important in a case claiming that the administrator or trustees interpreted the plan contrary to its plain meaning as in a case of ambiguous interpretation or operational problems outside the plan's language. While it is true that differentiated treatment could be indicative of arbitrary and capricious action, the opposite proposition, that uniformity establishes the absence of arbitrary and capricious conduct, is not necessarily true. See Morgan v. Mullins, 643 F.2d at 1324 n.4; Snyder v. Titus, 513 F.Supp. 926, 934 (E.D.Va.1981).
 
 
 21
 The District Court also found that the Committee's interpretation was not unreasonable, irrational, or arbitrary because of the need for a suspense period. It is this statement that leads us to question the District Court's appreciation of the Plan's operation and its relation to IRS regulations. The District Court for support cites two ERISA provisions concerning vesting standards. Yet there is no dispute that Dennard is 100% vested. What is at issue is whether he is entitled to interest on his account. The vesting provisions governing forfeitability affect the time of distribution and the percentage, not the actual amount of the distribution. While a plan need not wait until a break in service has occurred before distributing funds, many plans prefer to wait for a break to avoid any problems that might subsequently arise if a participant returns before a break and the plan has already forfeited the nonvested portion of the participant's account and reallocated it to remaining participants. The problem of forfeitures is also often handled by a "suspense" account, where any forfeited amounts are held separately until the end of the plan year in which a participant incurs a break, at which point the forfeitures are reallocated. The suspense account method is used primarily when distributions occur on a regular basis prior to a break in service. In Dennard's case, there is no question that the Plan should have maintained Dennard's account until the date that distribution was made. But there is no benefit to the operation of this Plan whatsoever, even aside from the specific Plan language, in not allocating a share of investment gains to accounts of terminated employees. The only possible difference is to whom the investment gains are allocated-and that is specified in the Plan: to "each Participant whose Service was not terminated under Article IX during such Plan Year and to the account of each Former Participant whose Account had not, as of the first day of such Plan Year, been segregated under Section 10.03(b) ..."
 
 IRS Rulings
 
 22
 Dennard finds support for his construction of the Plan from certain IRS rulings. The statutory interpretation of the IRS, as the agency charged to enforce and administer portions of ERISA, is entitled to some deference. See Columbia Gas Development Corp. v. Federal Energy Regulatory Commission, 651 F.2d 1146 (5th Cir. 1981); Kaneb Services, Inc. v. Federal Savings and Loan Insurance Corp., 650 F.2d 78 (5th Cir. 1981). Dennard relies on two IRS Rulings, Revenue Ruling 70-125, 1970-1 C.B. 87 (now superseded by Revenue Ruling 80-155, 1980-1 C.B. 84) and Revenue Ruling 73-103, 1973-1 C.B. 191. Both of these Revenue Rulings, as well as the superseding ruling, interpret Reg. § 1.401-1, which requires profit-sharing plans to provide definite predetermined formulas for allocating contributions and distributing funds. In Revenue Ruling 73-103, the IRS found that a plan which did not provide for adjustment to the accounts of plan participants who had ceased employment prior to retirement age did not meet the requirements of Section 401(a) of the Internal Revenue Code of 1954, as amended. Citing Revenue Ruling 70-125, this later ruling made clear that trust assets must be valued at least once a year. "Furthermore, the respective accounts of participants under such a trust must be adjusted in accordance with this valuation. For that purpose, the Revenue Ruling does not limit the term 'participant' to those that are currently employed by the employer." Revenue Ruling 80-155, while restating Revenue Ruling 70-125, specifically does not refer to or supersede Revenue Ruling 73-103.
 
 
 23
 Although the District Court made no mention of Revenue Ruling 73-103, the fact that the Committee's interpretation of the Plan is contrary to IRS interpretations lends support to a finding of arbitrary construction and lack of good-faith. The Committee attempts to argue that a one-year "suspense" period can be implied from the language of the Plan. The District Court determined that the suspense period was rationally related to the purposes of the Plan, stating "(t)hus, it is necessary to wait until a resigned or discharged former employee has sustained a one-year break before the nonforfeitable percentage of his account can be ascertained." While the use of suspense accounts has been sanctioned by the IRS, this use occurs only in the context of forfeitures. A plan which pays out benefits prior to the occurrence of a one year break may maintain any nonvested amounts, forfeitures, in a suspense account until the end of the plan year, at which time such forfeitures would be redistributed to remaining participants. In contrast a suspense period on earnings has absolutely no purpose when distributions are not made until a one year break in service has occurred. The Committee's citation to 26 C.F.R. § 1.411(a)-7(d)(4)(ii) is irrelevant to the issue in this case. Section 411 and the regulations promulgated thereunder deal with vesting requirements and when service may be disregarded. Within that context, certain distributions are deemed to have been made upon termination if made not later than the close of the second plan year following the plan year in which termination occurs. This, however, has no bearing on the requirements of § 401 which concerns the amount of benefits, as opposed to the percentage that is nonforfeitable.
 
 
 24
 The Committee also relies on the fact that the IRS, in reviewing the Plan in 1976 and 1979, found it to be qualified under ERISA. While the Committee admits that the issuance of a favorable determination letter by the IRS is not binding on this Court, the Committee minimizes the fact that favorable determination letters are based on a plan's language, not its operation. Since a plan's language can possibly be interpreted in more than one way, as evidenced by the dispute in this case, we cannot say that the IRS was interpreting the Plan according to the Committee's position, rather than that of Dennard. In fact, given the IRS Revenue Rulings discussed above, we may assume that the IRS, in passing on the Plan's qualification, interpreted § 5.03 of the Plan as providing for the allocation of profits or losses to all those with account balances.
 
 The Plan Speaks
 
 25
 The specific language of a plan is a major consideration in determining whether a plan's administrator or trustees have acted arbitrarily and capriciously or not in good-faith when the claim is made as here that the plan's language is clear. Consistency of the administrator's or trustee's interpretation of a provision with the remainder of a plan is one indication of good-faith. Here the Committee's interpretation that a Former Participant is only one who has incurred a Break in Service appears contrary to the clear language of the Plan. If "terminate" is not to be given its normally understood meaning, then it should have been defined as equaling a One Year Break in Service. See note 10 supra. Also when the definition of Service (see note 8 supra ) is read within the definition of Former Participant (see note 5 supra ), it is clear that "terminate" does not mean incur a Break in Service. If it did, there would be no need for using the defined term "Service." Nor does the use of "terminate" within other sections of the Plan seem to bear out the Committee's meaning. For instance, in § 9.03, dealing with forfeitures, the Plan provides that a forfeiture will occur "when the terminated Participant has incurred a One Year Break in Service...." (emphasis added).[13] In § 10.02 of the Plan, concerning preference for the form of payment, a more glaring example of the Committee's inconsistency of equating "terminating" with incurring a break in service for purposes of the definition of Former Participant is evident. This section states: "(i) The Former Participant is reemployed by the Employer before the Former Participant has incurred a One Year Break in Service, and ..." From this provision it seems obvious that a Former Participant need not have incurred a One Year Break to be categorized as such, and thus terminate is not equivalent to incurring a Break.
 
 
 26
 Second, the Committee's interpretation appears clearly to ignore the parenthetical phrase "(subject to Section 5.03 hereof)" of § 9.02, thereby rendering it meaningless. This parenthetical, rather, seems meant to refer to the Plan provision governing the allocation of investment earnings. Section 9.02 refers to the percentage of the account balance in which a participant has a vested right. For purposes of vesting, one may use the account balance as of the Plan Year prior to incurring a Break in Service. Section 5.03(c) contemplates that investment gains will be made to all employer accounts except any which might have been distributed during the Plan Year due to termination but prior to a Break in Service and any that have been segregated for periodic payment. It is to the advantage of all Participants, both those who are receiving a distribution and those who remain in the Plan, that valuations be made annually and that all those with accounts share in such valuation since the fund theoretically could lose money rather than gain. Any such loss should be shared by all those with account balances.
 
 
 27
 The fact that the Plan has conferred upon the Committee the power to construe and interpret all terms, provisions and conditions of the Plan and to determine all questions of coverage and eligibility, in § 11.06,[14] would not inhibit a finding that the Committee's interpretation is arbitrary and capricious. In fact, this same § 11.06 which defines the duties of the Committee, while delegating to this body the construction and interpretation of the terms, provisions, conditions, etc. of the Plan, specifically states, "provided that in all cases, the construction which will be required for the Plan to meet all requirements of qualification under the Code and Act shall control." The failure to meet the requirements of Revenue Ruling 73-103 by construing the Plan so as not to require the allocation of investment gains to all those with account balances could lead to disqualification. While a construction not consistent with IRS regulations is not determinative of arbitrary and capricious conduct, it is, as mentioned above, a factor, as is a construction contrary to the plain language of the Plan and inconsistent with other Plan provisions.
 
 
 28
 Two other factors, mentioned in Bayles, supra, uniformity in construction and additional costs, provide little succor to the Committee's argument. While the Committee points to the uniform construction of the Plan provisions and the fact that Dennard was not treated differently from any of at least five other employees who resigned or were discharged during the same time-an argument that the District Court found persuasive-we agree with the Eighth Circuit that even though consistently applied, "if the interpretation is unreasonable from the beginning, such an interpretation may still be arbitrary and capricious." Morgan, 643 F.2d at 1324 n.4. See also Snyder v. Titus, 513 F.Supp. at 934 ("being consistently wrong can hardly be sanctioned as right"). The Committee also relies on Bayles, supra and Paris, supra to support its argument that its interpretation of the Plan which favors those participants who remain in the Company's employ, as opposed to those who have resigned or been fired, is an interpretation allowed to the Committee. Bayles is not relevant since it was concerned with "anticipated costs" for a pension, as opposed to a profit-sharing, plan. See note 12 supra. Paris, while involving a profit-sharing plan, involved the interpretation of eligibility and the effect of a retroactive effective date. Neither Bayles nor Paris is directly applicable since each was concerned with unanticipated costs limiting resources to "the proper beneficiaries". Here, no additional benefits are being created since the interest earned on Dennard's account is not an expense to the Plan or the Company. Nor are the other participants entitled to the additional income.
 
 
 29
 Given the Committee's interpretation of the Plan which appears initially to be contrary to its plain meaning and its possible lack of consistency with several other provisions, as well as being at odds with IRS rulings, we hold that the District Court should not have granted summary judgment. The District Court, upon remand, should engage in a two-step process whereby it first determines the correct interpretation of the Plan provision and then proceeds to determine whether the Committee acted arbitrarily and capriciously. In making the second finding, the District Court should consider the factors we have discussed and also, after any additional discovery which the District Court might grant, any other factual matters bearing on the Committee's action.
 
 
 30
 Because of our disposition of this case, we treat only summarily the Committee's cross-appeal of the District Court's judgment denying its counterclaim for attorney's fees pursuant to § 502(g) of ERISA, 29 U.S.C. § 1132(g). Our opinion in Iron Workers Local No. 272 v. Bowen, 624 F.2d 1255 (5th Cir. 1980), elaborates our standards for awarding attorney's fees pursuant to ERISA. The District Court, after listing the determinative factors, stated that "none of the reasons discussed in these cases ... justify an award of attorney's fees to the Defendants." We believe that this statement is sufficient and does not constitute an abuse of discretion. We disagree with the Committee that Dennard's position is dubious or representative of bad faith on his part. Even the District Court indicated that Dennard's position was not "wholly implausible". Moreover, we reject without hesitation the Committee's suggestion that we establish a strong preference or presumption in favor of awarding fees to successful plan defendants in cases of this type. We believe that such a presumption would discourage plan participants or former participants from attempting to vindicate their rights. Where, as here, members of the administrative Committee are indemnified by the company, we see no benefit in presuming that the administrator, if successful, is entitled to attorney's fees.[15] ERISA's remedial purpose, to protect the beneficiaries of private pension plans, would not be furthered by a presumption in favor of successful plan administrators and against those participants or former participants who challenge in good faith those who administer the plans.[16]
 
 
 31
 REVERSED AND REMANDED.
 
 
 
 [1]
 In addition to the amendment and restatement of the Plan in April 1976, the Plan has subsequently undergone further amendment to comply with ERISA
 
 
 [2]
 Section 2 of ERISA provides:
 (b) It is hereby declared to be the policy of this Act to protect interstate commerce and the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.
 (c) It is hereby further declared to be the policy of this Act to protect interstate commerce, the Federal taxing power, and the interests of participants in private pension plans and their beneficiaries by improving the equitable character and the soundness of such plans by requiring them to vest the accrued benefits of employees with significant periods of service, to meet minimum standards of funding, and by requiring plan termination insurance.
 
 
 [3]
 A participant whose vested interest is not greater than $1,750 may be "cashed-out" prior to retirement age and without his consent
 
 
 [4]
 A Participant may make voluntary contributions, in which case a separate account is maintained for these contributions which are nonforfeitable at all times. No discussion of the voluntary contribution account is provided since this aspect of the Plan is not specifically at issue here
 
 
 [5]
 2.16
 "Former Participant" shall mean any Participant whose Service has terminated but who has a Vested Interest under the Plan which has not been paid in full.
 
 
 [6]
 2.24
 "Participant" shall mean any Employee or former Employee who has qualified as a Participant as provided in this Plan and for whose benefit the Employer has, or is obligated to make a contribution to the Plan as herein provided.
 
 
 [7]
 4.03 Allocation of Employer's Contribution. In order that each Participant's interest in the Fund may be determined, the Employer Account of each Participant shall be credited as of the last day of the Plan Year with his pro rata share of the Employer's contribution for such year in accordance with the following formula:
 (a) Each Participant shall be entitled to one unit for each One Hundred Dollars ($100.00) of Compensation paid or accrued for him during the Plan Year for which the contribution was made. Fractional amounts of Fifty Dollars ($50.00) or less shall be disregarded and fractional amounts in excess of Fifty Dollars ($50.00) shall be treated as One Hundred Dollars ($100.00).
 (b) Each Participant shall be entitled to have credited to his Employer Account the same proportion of the Employer's contribution for the Fiscal Year as such Participant's units for such year bear to the total units of all Participants of the Employer for such year. Reference to the Employer Accounts and units of Participants for purposes of allocating the Employer's contribution shall include the Employer Accounts and units of those Participants who became Participants, Retired, died, or became disabled during the Plan Year in question.
 
 
 [5]
 03 Periodic Determination of Participant's Accounts
 (a) Allocations in General. For the purpose of making allocations at the close of any Plan Year, the following rules shall govern. First, the net earnings and adjustments in value of the Fund shall be allocated pursuant to paragraph (c) of this section. Second, forfeitures during the Plan Year shall be allocated pursuant to paragraph (d) of this section. Third, the Employer's contribution for the Plan Year under consideration shall be allocated pursuant to Section 4.03 hereof....
 (b) Net Earnings and Adjustments. The net earnings and adjustments in value of the Fund for a particular Plan Year shall mean the fair market value of all the assets of the Fund as of the end of such Plan Year (determined pursuant to Section 5.02 hereof) less the sum of: ....
 (c) Allocation of Net Earnings and Adjustments. The net earnings and adjustments in value of the Fund for a particular Plan Year shall be allocated as of the last day of such Plan Year to the Employer Account and Voluntary Account, if any, of each Participant whose Service was not terminated under Article IX during such Plan Year and to the account of each Former Participant whose Account had not, as of the first day of such Plan Year, been segregated under Section 10.03(b), by crediting such Account with an amount equal to such net earnings and adjustments in value of the Fund multiplied by a fraction:
 (i) the numerator of which is the aggregate Account balance(s) of the particular Participant as of the first day of the Plan Year under consideration, and
 (ii) the denominator of which is the total of all Account balances as of the first day of the Plan Year under consideration of all Participants who were Participants at such time and whose Employment was not terminated under Article IX during such Plan Year, and of all Former Participants whose Accounts had not, as of the first day of the Plan Year, been segregated under Section 10.03(b) hereof.
 
 
 [8]
 2.34 "Vested Interest" shall mean the amount at any given time of the then balance of a Participant's Employer Account to which such Participant would be entitled if his Service were terminated at such time, pursuant to Section 9.02 hereof
 
 
 [9]
 01 Distribution on Termination of Service. In the event a Participant shall resign or be discharged by the Employer as distinguished from termination of Service by reason of Retirement, death, or Disability, such Participant shall be entitled to the greater of:
 (a) the aggregate of such Participant's voluntary contributions to the Plan, whether or not credited to his Voluntary Account, less all withdrawals as permitted herein; or,
 (b) the aggregate of
 (i) the balance of his Voluntary Account at the end of the Plan Year immediately prior to such termination (subject to paragraph 5.03),
 (ii) all voluntary contributions made during the Plan Year in which such termination occurs, and
 (iii) his Vested Interest in his Employer's Account, less
 (iv) all withdrawals from his Voluntary Account during such Plan Year.
 
 
 [9]
 02 Vested Interest. Subject to the other provisions of the Plan, in the event a Participant shall resign or be discharged from Service by the Employer, as distinguished from termination of Service by Retirement, death, or Disability, such Participant shall have a Vested Interest in his Employer's Account in an amount equal to the product of (i) his total Employer's Account in the Plan as of the last day of the preceding Plan Year in which he did not incur a One Year Break in Service (subject to Section 5.03 hereof) multiplied by (ii) the following percentage:
 Percent of
 Vested
 Years of Service Interest
 ---------------- ----------
Less than 2 Years of Service 0%
2 Years of Service but less than 3 20%
3 Years of Service but less than 4 30%
4 Years of Service but less than 5 40%
5 Years of Service but less than 6 50%
6 Years of Service but less than 7 60%
7 Years of Service but less than 8 70%
8 Years of Service but less than 9 80%
9 Years of Service but less than 10 90%
10 Years of Service or more 100%
 
 
 [9]
 2.31 "Service" shall mean the performance of duties by a person as an Employee of the Employer or any other employer which is a parent, subsidiary or affiliate of the Employer, or which is under common control with the Employer but only to the extent required by § 414 of the Code. Performance of duties shall not be deemed to be interrupted and Service shall not be deemed to be terminated by:
 (a) Leave of absence with the consent of the Employer granted on the basis of an established policy uniformly applied;
 (b) Authorized vacation;
 (c) Jury duty;
 (d) Temporary lay-off for lack of work followed by a recall and return to work within thirty (30) days from the date of lay-off; or
 (e) Absence due to service in the armed forces of the United States in time of war or national or local emergency (not included periods of re-enlistment) or under any law requiring compulsory military service, provided the employee returns to Service within ninety (90) days after discharge from such armed forces, or within such longer period of time as may be fixed by law for the protection of his employment rights.
 Should an Employee fail to return to Service within the time specified for such leave of absence, or after such temporary absence or authorized vacation, or after the period specified in (d) or (e), as appropriate, the Service of such Employee will be deemed terminated as of the end of such permitted period of absence.
 
 
 [10]
 2.23
 "One Year Break in Service" shall mean any consecutive twelve month period commencing at the beginning of a Plan Year during which an Employee has not completed more than 500 Hours of Service.
 
 
 [11]
 See, e.g., Riley v. MEBA Pension Trust, 570 F.2d 406, 410 (2d Cir. 1977); Wardle v. Central States, Southeast & Southwest Areas Pension Fund, 627 F.2d 820, 823-24 (7th Cir. 1980), cert. denied, 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981); Reiherzer v. Shannon, 581 F.2d 1266, 1272 (7th Cir. 1978); Morgan v. Mullins, 643 F.2d 1320, 1321 (8th Cir. 1981); Bueneman v. Central States, Southeast & Southwest Areas Pension Fund, 572 F.2d 1208, 1209 (8th Cir. 1978); Maness v. Williams, 513 F.2d 1264, 1265 (8th Cir. 1975) (case based on Labor-Management Relations Act); Rehmar v. Smith, 555 F.2d at 1366-67, 1369-71 (9th Cir. 1976) (Labor-Management Relations Act case); Lowenstern v. International Assoc. of Machinists and Aerospace Workers, 479 F.2d 1211, 1213 (D.C.Cir.1973) (pre-ERISA case)
 
 
 [12]
 The third factor, unanticipated costs resulting from reliance on a different construction of a plan's coverage or provisions, is of concern primarily in a defined benefit plan (a plan which defines the benefit that will be received, usually in the form of a certain amount per year of service, such as a traditional pension plan) rather than a defined contribution plan (a plan which defines the percent of contribution that the employer contributes each year, such as a profit sharing plan)
 
 
 [13]
 9.03 Forfeitures. Upon termination of Service for any reason other than Retirement, death or Disability, the difference between the amounts paid or payable to a resigning or discharged Participant under this Article IX and such Participant's total Account(s) in the Plan shall be deemed forfeited when the terminated Participant has incurred a One Year Break in Service and all amounts forfeited shall remain in the Fund and shall be allocated at the end of the Plan Year in which such terminated Participant has incurred a One Year Break in Service to the Participants in the Plan at that time pursuant to Section 5.03. No amounts in the Participant's Voluntary Account, if any, shall ever been deemed forfeited under any provision of this Plan
 
 
 [14]
 11.06 Duties. The Committee shall be the "plan administrator" and shall have all the duties and responsibilities of the "plan administrator" as defined and specified in the Code and the Act. The Committee shall have general supervision of the Plan and Trust and the enforcement of the terms and provisions hereof. Subject to the provisions of the Plan, the Code, the Act, and such restrictions as the Board of Directors may impose from time to time, the Committee shall have all powers necessary to accomplish these purposes, including but not limited to the right, power, and authority:
 (a) To make rules and regulations for the administration of the Plan which are not inconsistent with the terms and provisions hereof; which shall be uniformly and consistently applied to all Participants and Beneficiaries. Such rules and regulations shall be in writing and copies delivered to the Employer and all Participants and Beneficiaries.
 (b) To construe and interpret all terms, provisions, conditions, and limitations of this Plan including questions of eligibility and determination of the amount, number and time of payment of benefits hereunder; provided that in all cases, the construction which will be required for the Plan to meet all requirements of qualification under the Code and Act shall control.
 (c) To correct any defect or supply any omission or reconcile any inconsistencies that may appear in this Plan, in such manner and to such extent as they shall deem expedient to carry this Plan into effect for the greatest benefit of the Participants.
 (h) To conclusively determine all questions relating to the administration of this Plan when differences of opinion arise between interested parties and/or whenever it is deemed advisable to determine such questions in order to promote the uniform administration of the Plan for the benefit of all parties concerned.
 (emphasis added)
 
 
 [15]
 Section 11.02 provides:
 
 
 [11]
 02 Term and Service. The members of the Committee shall hold office until their death, resignation, removal or disqualification. By their signatures hereto the initial members of the Committee acknowledge their consent to serve in such capacity and agree to be bound by all of the duties and responsibilities of a Fiduciary as set forth in the Plan and Trust, and as provided under the Act. The members of the Committee shall serve without compensation for services but shall be indemnified by the Employer for all expenses actually incurred and against any claim, demand, cause of action or loss and for all expenses occasioned by any act or omission to act, taken or determined, by any such member in good faith
 (emphasis added)
 
 
 [16]
 The District Court dismissed Dennard's pendent state claims under United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218, 228 (1966). Because Dennard has not raised this dismissal in his appeal, we do not reach this issue. We also leave to the District Court, upon remand, the issue of attorney's fees for Dennard, if any