Donald A. **LOWRY**, Plaintiff,

v.

**BANKERS LIFE AND CASUALTY RETIREMENT PLAN, et al.,
Defendants.**

**Civ. A. No. CA-3-87-0293-C.**

United States District Court,
N.D. Texas,
Dallas Division.

Feb. 9, 1988.

Carl David Adams of Adams & Francis, Dallas, Tex., for plaintiff.

Stuart M. Reynolds, Jr., of Moore & Peterson, Dallas, Tex., for defendants.

## MEMORANDUM OPINION

CUMMINGS, District Judge.

This action before the Court is a claim by Donald A. Lowry ("Lowry") for retirement benefits under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. Sections 1001, *et seq.* Lowry has filed suit against Bankers Life and Casualty Retirement Plan ("Retirement Plan"), Bankers Life and Casualty Savings Investment Plan ("Savings Plan"), Bankers Life and Casualty Company ("Bankers"), Union Bankers Insurance Company ("Union") and Robert P. Ewing, Chester M. Lozowski, Paul Janus, Barth Murphy, Paul Higdon, Jack Zimmer, Tom Dunphy, Jim Dentle, Jack Gardiner, and Robert Shaw, as Members of the Pension Plan Committee and/or Fiduciaries (collectively called "Committee") seeking additional retirement benefits based solely on commissions paid to Lowry during or as a result of a nine and one-half month tenure in 1979 as a general agent for Union. After considering Lowry's claim, the Committee administering the retirement and savings plans (herein collectively called "Plan") denied Lowry's claim for additional benefits which, calculated in the light most favorable to Lowry, were stipulated to be $384,533.96. Lowry filed his complaint on February 10, 1987, claiming that he was wrongfully denied these additional retirement benefits.

Lowry claims that he is entitled to these additional retirement benefits based on the "plain language" of the documents governing the Plan. Further, Lowry claims that he was a "compensated employee" on the home office payroll for purposes of including such commissions in the retirement Plan calculation because he was subsidized on the home office payroll of Union and/or Bankers at the same time he was paid general agent's commissions.

Lowry was an employee of Bankers or its affiliates, including Union and Certified Life Insurance Company of California, from 1950 until his retirement in 1986. During a nine and one-half month period in 1979, Lowry was a general agent for Union pursuant to a general agent's contract. As an employee of Bankers and its affiliates, Lowry was eligible to participate in the Plans from and after the institution of such Plans in 1960, as amended or modified thereafter, until Lowry's retirement in

1986. In accordance with the Plan, Bankers made contributions based on Lowry's salary and personal production commissions. No contributions were ever made to Lowry's retirement account for the general agent commissions paid to Lowry pursuant to the general agent's contract with Union.

The dispute between the parties is the determination of the meaning of the language found in the Plans in question. The Plan contained the following definitions pertinent to the Plan Committee's review of Lowry's claim:

(h) *Compensated Employee.* The term "Compensated Employee" shall mean a person in the employ of an Employer or an Affiliate who receives Compensation. A person who acts solely in the capacity of an "Insurance Agent", or who is a trainee for that position, shall not be considered to be a Compensated Employee for the purposes of this Plan.

(i) *Compensation.* The term "Compensation" shall mean the total currently taxable remuneration paid by the Employers and the Affiliates to a Compensated Employee for services rendered. Compensation shall also include any amount contributed at a Participant's election under a plan that is qualified under Section 125 or 401(a) of the Code, but not any Employer contribution determined on the basis of the contributions made at the Participant's election or otherwise. Notwithstanding the foregoing, Compensation shall not include any payments made pursuant to an insurance agent or agency contract between the Company or an Affiliate and a payee; *provided,* that subsequent to February 28, 1977, Compensation shall include remuneration paid pursuant to insurance agent or agency contracts provided that the payee, at the time of payment, is employed on the home office payroll, or as a Field Manager, or as a field office clerical employee of the Company or an Affiliate.

Lowry contends that his 1099 overwrite commissions income received under his general agent's contract with Union clearly qualifies as "remuneration," and is compensation under the Plan and that his retirement benefits should have included such 1099 overwrite commissions payments, because the 1099 income was remuneration paid "pursuant to an insurance agent or agency contract" and because he was on the home office payroll of "the Company or Affiliate" at the time of said payments.

## Factual Findings

On March 1, 1979, Lowry decided to sever his employer/employee relationship with Union and/or Bankers and enter into a General Agent's Contract with Union, at which time he knowingly and voluntarily began acting in the capacity of an independent contractor.

To assist in Lowry's transition to his general agency relationship with Union, it was agreed that Union and/or Bankers would subsidize Lowry's general agency for a definite period of time. A letter agreement dated January 31, 1979, clearly and unambiguously sets forth the terms of the new relationship and, among other things, provides that, Union would provide to Lowry (1) his present salary of $56,000.00 with no bonus consideration for a period of twelve months beginning March 1, 1979, and ending on February 28, 1980; (2) fifty percent (50%) of his salary for a period of twelve months beginning March 1, 1980, and ending on February 28, 1981; (3) regular and normal expenses; (4) a car allowance in the pursuit of Lowry's recruiting, supervision, and development of business for Lowry's general agency relationship with Union; (5) personal office space and expenses for a secretary for a period of six months beginning March 1, 1979, and ending September 1, 1979, at which time Union would pay only fifty percent (50%) of Lowry's office rent, telephone and utilities; and (6) District Manager's salaries and normal expenses for a four month period of time. Lowry also received a $20,000.00 bonus for the period January 1, 1979, through February 28, 1979.

In May of 1979, Lowry requested additional support from Union and an extension of the subsidy arrangement for his general agency. Union declined to grant the increase and extension sought by Lowry.

In September of 1979, Union sought to terminate Lowry's general agent's contract and such contract was subsequently terminated effective December 15, 1979.

From and after December 16, 1979, Lowry was on the payroll of Bankers or its affiliate, Certified Life, until his retirement effective March 1, 1986.

At no time did Bankers or its affiliates cease making contributions to the Plan for Lowry's retirement, but such contributions, including those made during 1979, were uniformly and consistently based on his salary and commissions payable to him as a "Compensated Employee" pursuant to the Plan and were not based on overwrite commissions paid to him under the General Agent's Contract.

On March 17, 1986, Lowry accepted a lump sum benefit distribution in the amount of $253,788.98.

Lowry made written demand for the contested additional amount, stipulated to be $384,533.96. The Plan Committee, in letters dated June 25, 1986, and October 17, 1986, denied the claim and an appeal by Lowry.

After exhausting his administrative remedies, Lowry filed this action under Sections 1001 and 1132 of ERISA (29 U.S.C. §§ 1001 et seq.).

Bankers sells its insurance products through a direct writing sales force. These individuals are "captive" agents who sell only Bankers products and who are compensated by a combination of salary, bonus and certain commissions. The "captive" agents are common law employees of Bankers. Compensation to such employees, at all relevant times herein, has been included by Bankers and its affiliates in calculating contributions to the Plan and in determining benefits to retirees.

Union sells its insurance products primarily through a network of general agents. Such agents are independent contractors who may sell the products of other companies as well as products of Union. General agents are paid by Union based on earned income generated by their personal production and/or by overwrite commissions derived from the production of their employees or sub-agents.

Union's general agents have never been participants in the qualified pension plans and Lowry was aware of this fact prior to his decision to become a general agent.

During 1979, Union paid Lowry $76,804.93 as salary and personal production renewal commissions from policies previously written by Lowry as an employee of Bankers, pursuant to its agreement contained in the January 31, 1979, letter from John Coffman of Union.

During the period March 1, 1979, through December 15, 1979, Lowry did not earn any commission income based on his own personal production. However, his overwrite commissions in 1979 were $208,697.37 based on the production of other agents supervised by Lowry under his General Agent's Contract.

The overwrite commissions paid to Lowry in the years 1979 to 1986 and which he asserts should be included in calculating his retirement benefits, total $585,025.52.

Because it continued to carry Lowry on Union's payroll throughout 1979, pursuant to its agreement to subsidize Lowry's efforts to build a general agency operation, Union made contributions to the Plan based on his salary and permitted him to avoid a "break in service" under the Plan.

General agents are not covered by the Plan. As self-employed individuals, general agents may elect to establish their own retirement plans in which they may include their earned income for purposes of calculating retirement benefits, but may not be included in the qualified Plan for common law employees.

The Plan differentiates employees from persons acting solely in the capacity of an insurance agent or in training for the same. For those persons acting solely in the capacity of an insurance agent or in training for the same, no contributions are made

based on compensation paid to those persons because that compensation is not attributable to common law employment.

Subsequent to February 28, 1977, "Compensation" included "remuneration" paid by the Company to a "Compensated Employee" pursuant to insurance agent or agency contracts, provided that the payee at the time of payment is "employed on the home office payroll, or as a field manager, or as a field office clerical employee of the Company or an Affiliate."

Lowry contends that he is entitled to an additional $384,533.96 in retirement benefits based on the $585,025.52 of general agent's commissions paid to him pursuant to the general agent's contract because he was a "Compensated Employee" employed on the "home office payroll" at the same time he was a general agent.

Under the Committee's interpretation, Lowry was an eligible Plan participant to the extent he was paid a salary and personal production commissions on business written prior to his general agency relationship with Union. Lowry was not unique in the classification of him as an ineligible participant in the Plan based on the general agent's commissions paid to Lowry. As noted, neither Bankers nor its affiliates have permitted general agents to participate in the Plan.

Consistent with the treatment of all employees and all general agents, Plan contributions based on Lowry's salary and personal production commissions from his prior employment were made, but Plan contributions based on Lowry's overwrite commissions from his general agency were not.

The Plan provides that the Plan will be administered by a Committee which shall have authority:

(a) To determine all questions arising in such administration, including the power to determine the rights or eligibility of Employees and Participants and their beneficiaries, and the amount of their respective interests; and its decision thereon shall be binding upon all persons;

(b) To adopt such rules and regulations of uniform application as it may deem necessary for the proper administration of the Plan and consistent with its purposes, including procedures for submission of claims and appeal of denied claims.

The Plan further provides that:

This Plan is contingent upon, and subject to, obtaining and retaining the necessary approval of the Commissioner of Internal Revenue under the applicable provisions of the Code.

The Committee construed the Plan so as to exclude general agents from the definition of "Compensated Employee" and general agents' commissions from the definition of "Compensation" under the Plan. The Committee has uniformly construed the Plan to exclude general agents, and the evidence before the Court was to the effect that Lowry had knowledge that general agents were not covered by the Plan. Lowry argued, however, that he was wearing "two hats," one as an employee and one as a general agent, and that because of his "tailormade" situation, his general agent commissions should be covered under the Plan's definition.

### Discussion

■ The standard of review in an ERISA action is for the Court to determine whether or not the trustees' determination was arbitrary or capricious. The role of the court is limited in that "the clear weight of federal authority mandates that the trustees' determinations ... are to be upheld unless arbitrary or capricious." *Denton v. First Nat'l Bank of Waco, Texas,* 765 F.2d 1295, 1303 (5th Cir.1985), citing *Paris v. Profit Sharing Plan for Employees of Howard B. Wolf, Inc.,* 637 F.2d 357, 362 (5th Cir.), *cert. denied,* 454 U.S. 836, 102 S.Ct. 140, 70 L.Ed.2d 117 (1981). Under the arbitrary and capricious standard, the Court is obligated to focus on the evidence that was before the Plan Committee when the final benefit determination was made. *Denton,* 765 F.2d at 1304.

The Court's review is subject to a two-step process as set out in *Dennard v. Richards Group, Inc.,* 681 F.2d 306, 314 (5th

Cir.1982), wherein the *Dennard* court held that a court must first determine the correct interpretation of the plan's provisions and secondly to determine whether the plan administrators acted arbitrarily or capriciously in the light of the interpretation they gave the plan in the particular instance. *Id.*, at 314. Certain factors have been developed for the trial court to consider in evaluating whether or not the conduct of the plan administrators was arbitrary and capricious. Such factors are those as set forth in *Dennard*, at 314, citing *Bayles v. Central States, Southeast and Southwest Areas Pension Fund*, 602 F.2d 97, 99 (5th Cir.1979), wherein the *Dennard* court stated that:

> In *Bayles*, we indicated certain factors to be considered in applying the arbitrary and capricious standard: (1) uniformity of construction; (2) "fair reading" and reasonableness of that reading; and (3) unanticipated costs.... Along with the determination of the "legally" *correct* meaning of the plan provision in question, we also view as probative of the good faith of a trustee or administrator the following factors: (1) internal consistency of a plan under the interpretation given by the administrators or trustees; (2) any relevant regulations formulated by the appropriate administrative agencies ...; and (3) factual background of the determination by a plan and inferences of lack of good faith, if any. The fact that a trustee's interpretation is not the correct one as determined by a District Court does not establish in itself arbitrary and capricious action, but is a factor in that determination. *Dennard* at 314; see also *Denton*, 765 F.2d at 1304; *Ganze v. Dart Industries*, 741 F.2d 790 (5th Cir.1984).

The parties hereto have focused on the definitions of "Compensated Employee" and "Compensation" as set out in the Plan (and quoted hereinabove). The Committee interpreted the Plan so as to exclude general agents from the definition of "Compensated Employees" and general agents' commissions from the definition of "Compensation" under the Plan. The evidence conclusively established that the Committee had uniformly construed the Plan to exclude general agents and general agents' commissions from coverage under the Plan. No individual acting in the capacity of a general agent has ever been an eligible participant in the Plan.

Further, a fair reading of the Plan reveals that the term "compensation" is initially defined as the "total currently taxable remuneration paid by the Employers and the Affiliates to a Compensated Employee for *services rendered.*" (Emphasis added.) Under this definition, general agents' commissions would not be included in that such commissions were overwrite commissions paid to Lowry pursuant to the general agent contract and not pursuant to services rendered to the employer or the affiliates. Lowry relies on that portion of the definition that states:

> [P]rovided, that subsequent to February 28, 1977, Compensation shall include remuneration paid pursuant to an insurance agent or agency contracts provided that the payee, at the time of payment, is employed on the home office payroll, or as a Field Manager, or as a field office clerical employee of the Company or Affiliate.

Lowry claims that he is eligible to receive retirement benefits based upon his general agent contract commissions because such overwrite commissions income qualifies as "remuneration" and is compensation under the Plan. He further contends that such overwrite commission was "remuneration" paid "pursuant to an insurance agent or agency contract" and that he was on the "home office payroll" of the company or affiliate at the time of said payment.

Even though the parties seem to focus on the definition of "compensation," the Court finds that additional issues are the meaning of "remuneration" and "home office payroll." The Plan itself does not define "remuneration" which is susceptible to different meanings. In looking to the General Agent Contract as the source for commissions which Lowry claims are "remuneration" and thus "compensation" under the Plan, it appears that there may be a

different focus on the two words. The General Agent Contract, under the heading "Compensation," states that:

> The Company may pay commissions as set forth in the attached Schedules of Commission as compensation in full for the performance of services of the General Agent....

The Contract further provides, under the heading "Agents and Employees of General Agent," that:

> The compensation of Agents shall be paid by the General Agent out of *commissions* and other *compensation* paid to the General Agent as set forth in this Contract or schedules and supplements thereto. The company at its discretion may pay the Agent any *commission or remuneration* which are then or may thereafter become.... [emphasis added]

The Internal Revenue Code, 26 U.S.C. § 401(*l*)(2)(C), defines "remuneration" (in discussing a defined contribution plan) as:

> (i) total compensation or
>
> (ii) basic or regular rate of compensation,

whichever is used in determining contribution or benefits under the plan.

Under the Plan in question, no definition has been given. Further, *Black's Law Dictionary* defines "remuneration" as "reward; recompense; salary."

The evidence presented by the Committee illustrated that the intent of the provision to provide benefits based upon "remuneration paid pursuant to an insurance agent or agency contract" was aimed at field managers and other agents based upon *personal production,* not commissions earned because of the production of others. Lowry was consistently paid benefits for his personal production, as were other agents, all in keeping with the intent of the Plan. The Committee's interpretation simply restated the policy that the Committee claims to have been applying since the Plan's inception, and in and of itself was not arbitrary and capricious.

The Committee relied upon the uniform practice of excluding general agents from participation in the Plan for purposes of calculating the pension's funds, costs of benefits and the contribution rates necessary to sustain its costs. In *Paris,* 637 F.2d at 362, the court stated that:

> The trustees of [a] pension fund may properly enforce pension rules limiting pension benefits if [the] alternative would require inappropriate or unanticipated costs to the fund or as to potentially limit resources available to the proper beneficiaries.

If general agents are allowed to participate in the Plan, such participation would cause the pension fund to sustain a substantial unanticipated cost.

> The trustees of [a] pension fund may properly enforce pension plan rules limiting pension benefits if an alternative would require inappropriate or unanticipated costs to the fund so as to potentially limit resources available to the proper beneficiaries of the trust.

*Bayles,* 602 F.2d at 100.

Applying the arbitrary and capricious standard and the relevant factors outlined in *Dennard, supra,* the evidence conclusively established that the Committee has uniformly construed the Plan.

Further, a fair reading of the Plan reveals that its language is intended to cover only those participants who act in the capacity of a "home office employee (*i.e.,* being on the home office payroll)," "field manager," or "field office clerical employee of the Company or an Affiliate." Lowry bases his claim as being on the "home office payroll." The definition of "home office payroll" is not contained in the Plan itself and must be determined since Lowry relies on this designation for his claims of benefit. Although the evidence indicates that Bankers is the "home office," and Union and Certified Life are affiliates, Lowry contends he was on the "home office payroll" of Bankers, Union, or Certified Life during the period from March 1, 1979, until the date of his retirement on February 28, 1986. In order to qualify for benefits under the disputed provision, Lowry must have been on the "home office payroll," but of which company. From March 1, 1979, to December 15, 1979, dur-

ing the existence of the General Agent Contract, Lowry was on the payroll of Union, not Bankers, the seemingly "home office." The failure of the Plan to define "home office payroll" creates in and of itself an ambiguity thus allowing the Committee to interpret the Plan and the benefits to be derived.

■ If both the Committee and Lowry offer rational but conflicting interpretations of the Plan's provisions, "the trustees' interpretation must be allowed to control." *Miles v. New York State Teamsters Conference Pension & Retirement Fund Employee Pension Benefit Plan*, 698 F.2d 593, 601 (2nd Cir.), *cert. denied*, 464 U.S. 829, 104 S.Ct. 105, 78 L.Ed.2d 108 (1983).

■ Lowry placed a great deal of emphasis on the Committee's reliance on Revenue Ruling 69–569 as part of the basis for denying benefits to Lowry, alleging that such reliance was improper. The Committee was advised by its counsel that Revenue Ruling 69–569 would prohibit payment of benefits to Lowry based upon overwrite commissions arising out of the General Agent Contract. Revenue Ruling 69–569 deals with eligibility of an attorney to participate in a plan as an employee of a corporation, while at the same time receiving self-employment income. The ruling indicates that a plan will not qualify under I.R.C. Section 401(a) if it includes a participant who is not an employee, but that an employee who is also self employed, or wearing "two hats," would be allowed to participate but that:

> [T]he ... contribution's [sic] or benefits under the plan are to be based only on the amount that he receives as an employee of the corporation.

In reviewing the Committee's reliance on Revenue Ruling 69–569 and the advice of counsel, the Court's inquiry is "whether it was reasonable for the Committee to have relied on the opinion...." *Denton*, 765 F.2d 1295 (5th Cir.1985).

The Plan states that it is "contingent upon, and subject to, obtaining and retaining the necessary approval of the Commissioner of Internal Revenue...." The Court finds that the Committee's reliance

on Revenue Ruling 69–569 and the advice of counsel in denying benefits based upon overwrite commissions was reasonable under the circumstances.

The Committee has the right to exercise discretion when determining who qualifies for benefits. "On 'question of eligibility' it is settled ERISA law that 'wide discretion' may be exercised." *Hancock v. Montgomery Ward Long Term Disability Trust*, 787 F.2d 1302, 1308 (9th Cir.1986).

### Conclusion

The Court cannot say that the Committee acted arbitrarily or capriciously or with bad faith in interpreting its Plan and denying benefits to Lowry based upon overwrite commissions earned pursuant to the General Agent Contract. Therefore, the Court finds that defendants are entitled to judgment.

### JUDGMENT

This action came on for trial before the Court, Honorable Sam R. Cummings, United States District Judge, presiding, and the issues having been duly tried and a decision having been duly rendered,

It is ORDERED and ADJUDGED that the plaintiff, Donald A. Lowry, take nothing from the defendants, Bankers Life and Casualty Retirement Plan, Bankers Life and Casualty Savings Investment Plan, Bankers Life and Casualty Company, Union Bankers Insurance Company, and Robert P. Ewing, Chester M. Lozowski, Paul Janus, Barth Murphy, Paul Higdon, Jack Zimmer, Tom Dunphy, Jim Dentle, Jack Gardiner, and Robert Shaw, as Members of the Pension Plan Committee and/or Fiduciaries, and that this action be dismissed on the merits.

All costs are assessed against plaintiff.