UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 92-8458
_____

LEONARD N. IZZARELLI, on Behalf
of Themselves and All 1986
Participants in the El Paso Products
Company Stock Bonus Plan who are
similarly situated, ET AL.,

Plaintiffs-Appellees
Cross-Appellants,

VERSUS

REXENE PRODUCTS COMPANY, A Delaware
Corporation, REXENE CORPORATION, a
Delaware Corporation and EL PASO
PRODUCTS COMPANY STOCK BONUS PLAN,

Defendants-Appellants
Cross-Appellees,

and

TEXAS COMMERCE BANK - ODESSA,

Defendant-Cross-Appellee.

****************************************************************

_____

No. 92-8694
_____

LEONARD N. IZZARELLI, ETC., ET AL.,

Plaintiffs-Appellees,

VERSUS

REXENE PRODUCTS COMPANY, a
Delaware Corporation, ET AL.,

Defendants,

TEXAS COMMERCE BANK - ODESSA,

Defendant-Appellant.

**Appeals from the United States District Court**
**for the Western District of Texas**
**(MO-91-CA-016 and MO-91-CV-16)**
_____
**June 22, 1994**

Before WISDOM, BARKSDALE, and EMILIO M. GARZA, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

The primary issue in this action under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1461, concerns when benefits accrued for the participants in a defined contribution plan. Each of the several parties appeals. Rexene Products Company, Rexene Corporation, and Rexene's Stock Bonus Plan challenge the adverse judgment totalling approximately $7.2 million. Leonard N. Izzarelli and Donald J. Schelfhout (representing themselves and current and former Rexene Products Company employees who were Plan participants in 1986) contest both a credit the district court granted the Rexene defendants, and the judgment as a matter of law granted the Plan trustee, Texas Commerce Bank - Odessa, N.A. And, the Bank disputes the denial of its attorney's fees. We **AFFIRM** in part and **REVERSE** in part.

I.

At stake is Rexene Products Company's contribution, for Plan year 1986, to its Stock Bonus Plan (the Plan), an ERISA defined contribution employee benefit plan, 29 U.S.C. §§ 1001-1461.[1] In

_____

[1] A defined contribution, or individual account, plan, such as the Stock Bonus Plan, is "a pension plan which provides for an individual account for each participant and for benefits based

- 2 -

1983, Rexene Products Company (then The El Paso Products Company) was a division of The El Paso Company. Because the division was not profitable, El Paso sold it in 1984 to Rexene Corporation (the Corporation), a holding company formed and wholly owned by the division's senior management. The former division was renamed Rexene Products Company (Rexene).

Rexene established the Plan in 1985.[2] Texas Commerce Bank - Odessa was the Plan trustee; Rexene, the Plan's administrator and sponsor.[3] The Plan was administered by an Administrative Committee made up of Rexene officers. All Rexene employees, with the exception of a few officers and members of senior management, were eligible to participate in the Plan; and for Plan year 1986, there were approximately 1,050 participants. The Plan supplemented existing benefits plans, including the Savings Plan, discussed in

---

solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account." 29 U.S.C. § 1002(34) (1985); *see* **Connolly v. Pension Ben. Guar. Corp.**, 475 U.S. 211, 230 (1986) (unlike defined benefit plans, individual account plans "do[] not specify benefits to be paid, but instead establish[] an individual account for each participant to which employer contributions are made").

[2]  Rexene had established earlier an ERISA-qualified Savings Plan, under which Rexene would match voluntary employee contributions up to a certain level. The contributions were to be used to buy stock in Rexene.

[3]  The Bank and the Administrative Committee appointed by Rexene were named as Plan fiduciaries. As well, under ERISA § 33(21)(A), Rexene (named as the Plan Administrator) was a fiduciary, because, under the Plan, it "exercise[d] ... discretionary authority or discretionary control respecting management of [the] plan ... [and] ha[d] ... discretionary authority or discretionary responsibility in the administration of [the] plan." 29 U.S.C. § 1002(21)(A)(i), (iii).

note 2. Under the Plan, Rexene had the discretion to decide whether a contribution would be made for a given plan year, and, if so, in what amount.

The Plan specified that contributions would be made in the form of cash or stock in the Corporation. Rexene had set an informal goal of, over five years, contributing to the Plan approximately 22-25% of the Corporation's stock (approximately 543,000 shares). In accordance with this goal, in early 1986, Rexene contributed 135,725 shares for Plan year 1985. The shares were valued at $1.00 per share, using a valuation date of December 31, 1985 -- the last day of the tax year to which the 1985 contribution was attributed.

In early 1987, Rexene again voted a contribution: 101,794 shares for the Plan year 1986. The Corporation authorized it in February 1987; and Rexene informed Plan participants of this in a bulletin board notice. A stock certificate representing the shares was prepared on March 2, 1987, and was listed on the Corporation's books as being transferred on that date to the Bank as Plan trustee. But, the certificate was not delivered to the Bank until that May; under cover letter dated May 1, it was received by the Bank on May 13.

The 1986 contribution was authorized before the shares were appraised. The first appraisal, not ordered until May 1, 1987, used a valuation date of December 31, 1986, consistent with the procedure that had been followed for the 1985 contribution. The appraisal, delivered on June 15, 1987, reflected a marked increase

in the value: $76.34 per share as of December 31, 1986.  The day after the appraisal was delivered, Rexene notified the participants of the value, and the approximate amount that would be allocated to each participant's account.  By means of a bulletin board notice, Rexene informed the participants that they would receive approximately one share for every $303 of 1986 straight-time earnings.[4]  The notice stated that account statements would be prepared and mailed within the next two weeks.

Rexene's accountants then began to allocate the contribution among the participants.  But, while the accountants were preparing the account statements, they realized that the contribution, at $76.34 per share (approximately $7.7 million total), was an "overcontribution".  That is, it would cause many accounts to exceed the Internal Revenue Code § 415 limit on excludable income contributed to qualified benefit plans.[5]  Exceeding the § 415 limits could have disqualified the Plan under ERISA.  *See* 26 U.S.C. § 415(a)(1)(B).  Accordingly, Rexene began considering ways to deal with the problem.  Regardless of what strategy Rexene chose, a Plan amendment was needed.

---

[4]    Rexene provided Plan participants with this information in order to allow them to calculate the amount that would be allocated to each account.

[5]    Contributions to defined contribution plans are excludable from taxable income if they do not exceed the lesser of $30,000 or 25% of the taxpayer's gross wages in a given year. 26 U.S.C. § 415(c).    The section aggregates amounts excluded under all qualified benefit plans; for Rexene, therefore, contributions to the Savings Plan would be aggregated with those to the Plan.

Outside counsel, who had helped to develop the Plan, first suggested that Rexene follow the terms of the Plan, specifically § 4.3, as closely as possible. That section provided that, if a contribution would cause any account to exceed the § 415 limit, the excess was to be "allocated and reallocated" to the other accounts, until all participants reached their § 415 limits. If any excess still existed, it was, with the permission of the Internal Revenue Service, to be held in a "suspense account" for allocation in future years to the accounts of those who had been participants when the overcontribution occurred. Outside counsel advised, however, that it might take five to six months for the IRS to issue a determination letter with regard to the suspense account. Despite this anticipated delay, he advised Rexene that IRS approval of such an account was likely.[6]

Rexene did not choose this alternative. The district court found that the determination letter delay made this alternative unattractive to Rexene, because it had begun, in April 1987, to investigate selling the company or taking it public. By late July 1987, Rexene -- anticipating a sale -- had prepared a draft Agreement of Merger. (The sale occurred in April 1988.)

---

[6]    But, outside counsel also advised that the IRS was not likely to approve a suspense account of the exact type contemplated by § 4.3. That is, the account was to be allocated in later years to only the accounts of those whose allocations had created the over-contribution -- *i.e.*, not also to the accounts of participants who joined the Plan in later years. Outside counsel considered it unlikely that the IRS would approve this, because it could violate 26 U.S.C. § 404(a)(4)'s anti-discrimination provisions.

The district court found also that Rexene was motivated by a desire to ensure that its employees had no reason to frustrate the sale. Many of the highly-paid employees -- who had voting rights with respect to sales or mergers -- were dissatisfied with the proposal to "allocate and reallocate" the 1986 overcontribution pursuant to § 4.3. These employees (part of the group whom the parties classify as "heavy savers") had contributed large amounts to the Savings Plan in 1986. Thus, they were closer than others to reaching § 415's limits. Therefore, under the Plan's "allocate-reallocate" strategy, the heavy savers would receive very little of the 1986 contribution, whereas the others would receive comparatively more through the reallocation process.

At trial, however, inside counsel emphasized repeatedly that the impending sale did not affect Rexene's Plan decisions. Consistent with this testimony, Rexene contends that its decision to amend the Plan in the manner it did was motivated primarily by its desire not to penalize the heavy savers. Members of Rexene's management testified that there "was a very, very strong feeling of management, that the people who had [invested in the Savings Plan] ... [had indicated] commitment to the company", because the Savings Plan's assets were used to purchase Rexene stock. And, outside counsel testified that, in addition to this concern, Rexene's interest was in maintaining the Plan's ERISA-qualified status. Similarly, inside counsel testified that Rexene did not follow Plan § 4.3 because

> it would not have achieved ... the equitable
> distribution that we wished to achieve. We had

> never foreseen the possibility of the problem that we had gotten into. And we did not want ... to penalize the savers and we felt [that] ... ultimately, everybody could receive the benefit of that 101,000 shares and ... we would continue to follow the equitable allocation based upon the ratio of their salary to the aggregate salary.

Although inside counsel testified that the value of the deduction allowed for shares in a suspense account would affect Rexene's value at the time of sale, he testified that Rexene was not concerned as much with its value, as with "trying to determine a solution to the over-contribution problem".

As an alternative to following § 4.3's allocation-reallocation process (with its attendant determination letter delay), outside counsel suggested that the 1986 contribution be allocated to take all participants up to their § 415 limits, with those who, but for § 415, would have received more stock, being given an additional cash bonus outside the Plan, equivalent to the value of the stock they would have received. After this, the excess would be placed in a suspense account that would be used as part of the contribution for subsequent plan years for all participants, not just those who were participants when the overcontribution was made.

Unlike outside counsel's first alternative, this proposal would not require waiting for a determination letter, because, he advised, this type of allocation was "not unusual". Thus, although the amendment would still have to be submitted to the IRS, Rexene would "be safe in pursuing this course of action immediately and in notifying the participants immediately as to their actual account

balances without making the notification subject to[,] or the actual allocation await[,] the determination letter." But, Rexene rejected this alternative also, partly because it would have necessitated paying large bonuses outside the Plan, which Rexene was not in a position to do, and partly because it, like the first alternative, had the effect of penalizing heavy savers.

Rexene decided on the following Plan amendment. On September 9, 1987, it submitted for IRS approval the Second Amendment, which would allocate to each participant shares valued at 6.32% of his or her 1986 considered compensation.[7] Using this system, Rexene could allocate only about 26,000 shares;[8] the remainder would revert to Rexene. The amendment's provision for the reversion was based on a "mistake of fact" theory, one of the few justifications, under the Plan, for a reversion. Outside counsel advised, however, that the IRS might not approve an amendment that allowed a reversion.

On counsel's advice, therefore, Rexene authorized further amendment as necessary to allow the Plan to maintain its qualified status.[9] This authorization was submitted to the IRS on February 1, 1988, as part of the Fourth Amendment to the Plan, discussed

[7] Rexene chose 6.32% because that percentage allowed it to allocate shares up to the § 415 limits of most of the heavy savers. Even using this relatively small percentage, however, 84 of the approximately 1,050 participants would have exceeded their § 415 limits. When the 6.32% scheme was effected, these 84 participants received an additional bonus outside the Plan.

[8] There is no dispute that this allocation was less than that which could have been allocated without violating § 415.

[9] Rexene's outside counsel testified that it was customary to authorize whatever further amendments were necessary, when attempting to secure IRS approval of plan amendments.

*infra.* On February 11, 1988, the IRS issued a favorable determination letter, pursuant to which it implicitly disapproved the reversion under the Second Amendment. Pursuant to Rexene's further amendment authorization, however, the IRS approved the Fourth Amendment. Under that amendment, each participant would receive, as under the Second Amendment, shares valued at 6.32% of 1986 considered compensation; however, the excess would be placed in a suspense fund, rather than reverting to Rexene. The Fourth Amendment called for the excess to be distributed in later years to all participants, including those who joined after 1986.

As stated, under the 6.32% allocation, Rexene could have allocated approximately 26,000 shares ($76.34 per share). On February 4, 1988, however -- while the IRS approval was pending -- Rexene commissioned another appraisal, with a valuation date of May 31, 1987. The 1986 contribution had, as stated, been appraised at $76.34 per share, using a valuation date of December 31, 1986, the last day of the tax year to which the contribution was attributed. As also noted, the same valuation method had been used for the 1985 contribution, made in early 1986. And, while seeking approval of the Second and Fourth Amendments, Rexene had on several occasions advised the IRS that the 1986 contribution was made on February 26, 1987 (when approved by Rexene), and valued at $76.34 per share -- *i.e.,* as of December 31, 1986.

After Rexene had submitted its amendments to the IRS for approval, however, outside counsel advised that it would be preferable instead to value the contribution as of the date it was

contributed to the trustee.  As discussed *infra*, he advised that the contribution be re-appraised, to determine its value as of May 31, 1987, the last day of the month in which the stock certificate representing the 1986 contribution was delivered to the Bank. Using the May valuation date resulted in an appraisal of $158.37 per share, or approximately $16.2 million overall.[10]  Using this value caused only 11,775 shares to be allocated, with the remaining 90,019 being placed in the suspense account.  Again, this allocation was significantly less than the amount that could have been allocated (even using the higher valuation) without violating § 415.  Plan participants were advised of the new valuation by a bulletin board notice dated March 11, 1988.  The notice also stated that the IRS had approved a revised allocation method for the 1986 contribution, and that the change was required by law.

Finally, in early 1988, shares were allocated under the 6.32% formula, and statements distributed to participants, for Plan year 1986.[11]  When Rexene was sold in April 1988, the 90,019 suspense account shares were sold, with the Plan receiving $203.95 per share.  These proceeds were allocated among all participants for Plan years 1987-1991, using the Fourth Amendment formula.  In all,

---

[10]  As discussed *infra*, the higher the value attributed to the contribution, the larger the tax deduction for Rexene.  The value of the contributed shares thus affected Rexene's value.  As also noted, however, Rexene contends that this was not its primary motivation either in deciding to amend the Plan, or in deciding when to value the stock.

[11]  For its 1986 tax return, filed in September 1987, Rexene had taken a deduction for the 25,580 shares, using the more conservative $76.34 valuation.

1986 participants received the equivalent of 82,248 of the 101,794-share 1986 contribution.

Plaintiffs -- 1986 participants -- brought this action in February 1991, under ERISA § 502, 29 U.S.C. § 1132.[12] *See, e.g.*, ***Christopher v. Mobil Oil Co.***, 950 F.2d 1209, 1220 (5th Cir.), *cert. denied*, ___ U.S. ___, 113 S. Ct. 68 (1992) (discussing § 1132, which provides for civil actions under ERISA). They sought to enforce ERISA § 204(g), 29 U.S.C. § 1054(g) ("anti-cutback" provision), and §§ 404 and 405, 29 U.S.C. §§ 1104, 1105 (fiduciary duty provisions). They claim, *inter alia*, that Rexene, the Corporation, and the Bank breached their fiduciary duties and violated ERISA's benefits protection provisions by failing to follow the Plan, amending the Plan, and re-valuing the 1986 contribution; and that this reduced the accrued benefits for 1986 participants. (The Plan was also named as a defendant, for the limited purpose of effectuating whatever relief was granted. The Plan, Rexene, and the Corporation are "the Rexene defendants".)

During a bench trial, at the conclusion of plaintiffs' case, the district court granted the Bank judgment as a matter of law. After trial, it held against the Rexene defendants, based on finding that the 1986 contribution was contributed on March 2, 1987, and accrued then, at the $76.34 value. In the alternative,

---

[12] Several months after suit was filed, Rexene and the Corporation filed for bankruptcy. While the bankruptcy was pending, the district court certified the class, denied Rexene and the Corporation summary judgment, and stayed the case pending resolution of the bankruptcy proceedings. In April 1992, the bankruptcy court granted plaintiffs' motion to lift stay, and later did so to permit this appeal.

it found that the contribution accrued when Rexene gave participants the information necessary to calculate their individual balances. (The first bulletin board notices stating that participants would receive approximately one share for each $303 of 1986 compensation were posted in March 1987.) The court concluded that these accrued benefits were decreased by the Fourth Amendment, in violation of ERISA's anti-cutback provision, 29 U.S.C. § 1054, and in violation of Rexene's fiduciary duty under ERISA, 29 U.S.C. § 1104.

The Rexene defendants moved to modify the judgment, or in the alternative for new trial; plaintiffs, to amend the findings of fact and conclusions of law. The district court entered amended conclusions of law and findings of fact, and denied the new trial. In an amended judgment, it awarded plaintiffs $4,807,636, together with $1,786,689 for lost interest and earnings, and $594,856.15 for attorneys' fees and costs. The award was offset partially by a credit awarded Rexene for the portions of the 1986 contribution allocated to 1986 participants post-Plan year 1986. Finally, the court denied the Bank attorney's fees.

## II.

The Rexene defendants assert, *inter alia*, that they neither violated 29 U.S.C. § 1054(g) (the anti-cutback provision), nor breached their fiduciary duty under 29 U.S.C. § 1104. Plaintiffs cross-appeal from both the credit granted the Rexene defendants, and the judgment as a matter of law granted the Bank. The Bank appeals from the denial of its attorney's fees.

We review the district court's findings of fact only for clear error. Fed. R. Civ. P. 52(a); *e.g., Anderson v. City of Bessemer City*, 470 U.S. 564 (1985); *Brock v. El Paso Natural Gas Co.*, 826 F.2d 369 (5th Cir. 1987). A finding of fact is clearly erroneous if, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson*, 470 U.S. at 573 (internal citations and quotation marks omitted).

We review freely conclusions of law, *Salve Regina College v. Russell*, 499 U.S. 225 (1991). Along that line, in actions brought under 29 U.S.C. § 1132 involving the interpretation of an ERISA-covered plan, we likewise construe a plan's terms, unless the "benefit plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan". *Haubold v. Intermedics, Inc.*, 11 F.3d 1333, 1336 (5th Cir. 1994) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)); *accord*, *Harms v. Cavenham Forest Indus., Inc.*, 984 F.2d 686, 688 (5th Cir.), *cert. denied*, ___ U.S. ___, 114 S. Ct. 382 (1993); *Morales v. Pan Amer. Life Ins. Co.*, 914 F.2d 83, 87 (5th Cir. 1990).

Rexene had discretion to amend the Plan, § 10.1, and to decide whether, and when, to make contributions, § 3.2. And, the Administrative Committee had discretionary authority to determine eligibility, § 7.2(e), to allocate contributed stock among participants in the "time and manner" it saw fit, § 4.4., and to construe the terms of the Plan, as well as to "correct any defect,

- 14 -

supply any omission, or reconcile any inconsistency" in it, §
7.2(b), (c).

Accordingly, when reviewing the Plan documents and decisions
made with regard to the Plan, we must defer to the Administrative
Committee's or Rexene's interpretation, reviewing it only for abuse
of discretion. *E.g.*, **Salley v. E.I. DuPont de Nemours & Co.**, 966
F.2d 1011, 1014 (5th Cir. 1992). (For ease of reference, and
because both were administrators and decision-makers for the Plan,
we refer to the Administrative Committee and Rexene as "Rexene".)
"In applying the abuse of discretion standard, we analyze whether
the plan administrator acted arbitrarily or capriciously."[13] **Id.**
at 1014 (citing **Penn v. Howe-Baker Eng'rs, Inc.**, 898 F.2d 1096,
1100 n.2A (5th Cir. 1990)); **Vasseur v. Halliburton Co.**, 950 F.2d
1002, 1006 (5th Cir. 1992) (citing cases). But, obviously,

---

[13]    We note that our abuse of discretion/arbitrary and capricious
standard of review is informed by two additional factors. First,
as in **Bruch**, the Plan is a defined-contribution, rather than a
defined-benefit, plan. All contributions were made by the
employer. Thus, "`every dollar provided in benefits is a dollar
spent by ... [Rexene], the employer; and every dollar saved by the
administrator on behalf of his employer is a dollar in [Rexene's]
pocket.'" **Lowry v. Bankers Life & Cas. Retirement Plan**, 871 F.2d
522, 525-26 & n.7 (5th Cir.) (quoting Third Circuit decision in
**Bruch**, 828 F.2d 134, 144 (3d Cir. 1987), and construing **Bruch**, 489
U.S. 101), *cert. denied*, 493 U.S. 852 (1989). This fact leads to
an inference that "the administrator or fiduciary is operating
under a possible or actual conflict of interest", *see* **Bruch**, 489
U.S. at 115.

Second, as discussed *infra*, we obviously give no deference to
Rexene's decisions where they turn purely on questions of law.
These additional considerations "must be weighed as ... `factor[s]
in determining whether there is an abuse of discretion.'" **Lowry**,
871 F.2d at 525 (quoting **Bruch**, 489 U.S. at 115, 109 S. Ct. at 956
(citation omitted)).

- 15 -

> in contrast to the great deference we grant the [administrator's] interpretations of the Plan, which involve contract interpretation, we accord no deference to [its] conclusions as to the controlling law, which involve statutory interpretation. The interpretation of ERISA itself must be made *de novo* by the court.

**Penn**, 898 F.2d at 1100 (footnote and citations omitted).

### A.

The Rexene defendants contend first that the district court erred in concluding that the 1986 contribution accrued, and therefore became subject to ERISA's anti-cutback provision, prior to its formal allocation to the participants; second, that the valuation date was May 31, 1987 (when the stock was valued at $158.37), not, as the district court concluded, either December 31, 1986, or February 26 or March 2, 1987 (when the district court found the stock was worth $76.34 per share); third, that it was error to conclude both that amending the Plan was a breach of fiduciary duty, and that the 1986 contribution was required to be allocated only to 1986 participants; and, fourth, that a prior settlement in another action bars some plaintiffs from asserting claims in this action.

### 1.

Section 204(g)(1) of ERISA, 29 U.S.C. § 1054(g)(1) (anti-cutback provision), with exceptions not applicable here, prohibits plan amendments which decrease participants' "accrued benefits". 29 U.S.C. § 1054(g)(1).[14]   The key to the district court's

---

[14]   The section provides:

> The accrued benefit of a participant under a plan

- 16 -

conclusion that the amendments violated § 1054(g) was its finding that, when the Plan was amended, the 1986 contribution was already an "accrued benefit" protected by § 1054(g), pursuant to its finding that the contribution accrued when it was contributed to the Plan. As noted, we review only for abuse of discretion Rexene's administrative decisions with regard to the Plan. But, in this instance, the record does not show that Rexene made any decision with regard to when benefits would accrue. Further, the Plan does not define the term "accrued benefits". In sum, we are faced instead with a question of law, reviewed freely, involving the interpretation of ERISA and the Plan documents. *Penn*, 898 F.2d at 1100.

a.

Rexene maintains that the 1986 contribution did not accrue until April 1988, when it formally notified participants of their account balances.[15] For defined contribution or "individual account" plans, ERISA defines accrued benefits as "the balance of the individual's account". 29 U.S.C. § 1002(23)(B). It does not

---

> may not be decreased by an amendment of the plan, other than an amendment described in section 1082(c)(8) or 1441 of this title.

29 U.S.C. § 1054(g)(1) (1988). The Plan tracks this section; § 10.1(c) prohibits amendments that "[d]ecrease the accrued benefit of any" participant.

[15] Under the Plan, each participant's account was defined as "the ledger account maintained by the Administrative Committee to set out [the participant's] proportionate interest" in the common Plan trust fund. Until a contribution was allocated to a participant's account, it would not appear on the ledger account statements that the Administrative Committee sent to that participant.

state, however, when a contribution *becomes* part of that balance; and few cases have addressed the issue.[16] In one of the few cases to do so, the court remanded for further fact finding on when benefits accrue, because

> [w]hile `allocations' are made to each participant's account monthly ... the financial balance of ... each individual's account is valuated [sic] annually according to [the plan]. How the contributions have been made under past practice and *when they become accrued benefits for ERISA purposes* are undeveloped in the record.

---

[16]    As the Rexene defendants note, the vast majority of cases that discuss the definition of "accrued benefits" involve defined benefit, rather than defined contribution, plans. These defined benefit cases are of little use to the present inquiry, however. Under ERISA § 3(23), 29 U.S.C. § 1002(23), the definition of "accrued benefits" differs completely, depending on whether a defined benefit or a defined contribution plan is involved.

Accrual of benefits in defined *benefit* plans focuses on when the plan is funded and participants complete eligibility requirements. *See, e.g.*, **Independent Assn. of Publishers' Employees, Inc. v. Dow Jones & Co., Inc.**, 671 F. Supp. 1365, 1368 (S.D. N.Y. 1987) (in defined benefit plan, benefits must be funded, not "merely contemplated or expected", to be "accrued benefits"); **Lynch v. J.P. Stevens & Co., Inc.**, 758 F. Supp. 976, 1001 (D. N.J. 1991) (in defined benefit plan, funded benefits did not become accrued until participants satisfied length-of-service requirements in Plan document).

By contrast, for defined *contribution* plans, the key is when a contribution becomes part of -- is allocated to -- a participant's account. *E.g.*, **Hickerson v. Velsicol Chem. Corp.**, 778 F.2d 365, 376 (7th Cir. 1985) ("accrued benefit ... in a defined-contribution plan is the balance *allocated* to [a participant's] individual account"; upon conversion of defined contribution to defined benefit plan, participants are entitled to "value of the accounts *allocated* to [them] at the time of conversion", but not to value of future returns on trust assets) (emphasis added), *cert. denied*, 479 U.S. 815 (1986); **Rummel v. Consol. Freightways, Inc.**, No. C-91-4168 DLJ, 1992 WL 486913 at *3 (N.D. Cal. 1992) (not reported in F. Supp.) (upon plan termination, participants have no legally recognized interest in unallocated (*i.e.*, unaccrued) plan assets held in suspense fund).

- 18 -

*Johnson v. St. Francis Xavier Cabrini Hosp.*, 910 F.2d 594, 597-98 (9th Cir. 1990) (emphasis added).  Thus, the crucial question is how, and when, benefits were allocated according to the Plan.

In finding that the 1986 contribution became accrued benefits when it was contributed, the district court stated:

> [Rexene] intended the 101,794 shares [the 1986 contribution] to be contributed and allocated to the 1986 Plan participants.  No employee was required to do anything else to qualify as a 1986 Plan participant.  All the information necessary to make allocations under the Plan's formula were either known or readily available to [Rexene]. Although REXENE argues to the contrary, the task of allocation was "ministerial" ... *thus the contribution when made was an "accrued benefit" for purposes of ERISA*.

(Emphasis added.)

As the district court found, the Plan did specify a formula for allocating contributions; it contemplates that allocation will occur according to that formula, at some time after a contribution is made.  Rexene does not dispute that the contribution was made with the intention that it would be distributed among participants' accounts.  Further, when the stock certificate was issued, and transferred to the Bank to be contributed to the Plan -- and until it discovered the overcontribution problem -- Rexene no doubt contemplated that the contribution would be allocated to 1986 participants.  But, the mere fact that the 101,794 shares were *contributed* to the Plan does not, according to the Plan, mean that their allocation was either automatic or simultaneous with that contribution.

The Plan draws a distinction between contribution and allocation. Even had the 1986 contribution not caused § 415 problems, the Plan does not require it to be allocated immediately upon contribution. Under Plan § 1.21, contributions initially are held in the "Unprorated Fund", *i.e.*, "that portion of the assets or property in the [Plan] ... which at any particular time, *has not been allocated to a particular Member's Account*...." (Emphasis added.)[17] A contribution cannot remain in the Unprorated Fund indefinitely; Plan § 4.4 requires that a contribution be allocated before the end of the Plan year in which it was contributed.[18] Other than these restrictions, however, Plan § 4.4 gives Rexene "complete discretion" to control the "time and manner of allocating Stock among [participants'] Accounts".

In addition, allocation of the 1986 contribution was not merely "ministerial". Rexene concedes that the allocation was *intended* to be ministerial, and that it had been so for the 1985

---

[17] Also, the Plan prohibits the reversion of a contribution to Rexene or the Corporation, unless it (1) was made because of a mistake of fact; (2) caused the plan to become disqualified under I.R.C. § 401, 26 U.S.C. § 401; or (3) is determined by the IRS not to be deductible under I.R.C. § 404, 26 U.S.C. § 404. The Plan was never disqualified under § 401; and the entire 1986 contribution was determined to be deductible under § 404. As discussed, although Rexene attempted originally to amend the Plan based on a mistake of fact theory (the Second Amendment), the IRS implicitly rejected this justification when it approved the Fourth Amendment to the Plan, instead of the Second Amendment.

[18] We note, however, that this did not occur in this case; on counsel's advice, even the initial 11,775 shares of the 1986 contribution apparently were not allocated (or at least account statements were not distributed showing the allocation) until 1988. Pursuant to the Fourth Amendment, however, the normal allocation procedure set out in § 4.4 -- including the one-year allocation deadline -- was suspended until the 101,794 shares were allocated.

contribution. The 1986 contribution, however, was different, due to the tremendous -- and somewhat unexpected -- increase in the stock's value. Outside counsel advised Rexene not to make even a partial allocation, because to do so without knowing "what [Rexene's] problems were under the [tax] code", *i.e.*, § 415, would risk disqualification. Outside and inside counsel testified that, regardless of whether the stock was valued at $76.34 or $158.37, the increase in value made it impossible to allocate the entire 101,794 shares for Plan year 1986, without reaching § 415's limit for all participants, and exceeding it for some.

The Plan does not provide for dealing with such an overcontribution. If allocation to one account would cause that account to exceed § 415's limit, the Plan provides for the excess to "be reallocated to the Accounts of other [participants]". In such cases, however, the Plan allows this "allocate-reallocate" procedure only on the condition that "the Excess amount allocated to each such other [participant's] Account shall not exceed the amount which can be allocated without ... exceeding" § 415. The 1986 contribution, even if allocated and reallocated among all participants' accounts, would have exceeded § 415's limit.

The Plan does contain some guidance for when the allocate-reallocate process causes *some* accounts to reach (and potentially exceed) § 415's limit. It authorizes creation of a suspense account for overcontributions, to be used for future contributions to the accounts of the participants whose accounts had created the excess. The Plan does not specify, however, whether a suspense

account could be created where, as here, *all* participants' accounts would reach or exceed § 415's limit.  Further, as stated, creation of such a suspense account was conditioned on IRS approval.[19]

Finally, even with such approval, the creation of a suspense account was proper only if the overcontribution was the result of (1) allocation of previous forfeitures; (2) a mistake in estimating a participant's considered compensation, or (3) "other facts and circumstances which the Commissioner of the [IRS] finds justify" the creation of a suspense account.  Plan § 4.3.  Only the third circumstance would have applied.  Thus, in order to allocate the shares according to the Plan, the Commissioner would have had to find that the circumstance that created the overcontribution justified the creation of a suspense account, and also would have had to approve the operation of the suspense account as specified by the Plan.

In sum, the Plan did not, by its terms, contain a method for dealing with the overcontribution; nor did it seem likely that the IRS would approve creation of the suspense account contemplated by the Plan.  *See supra* note 19.  Therefore, Rexene was unable simply to follow the Plan allocation process.  When it made the 1986 contribution, Rexene did not -- as the district court characterized

---

[19]    As discussed, outside counsel advised, in the process of drafting the challenged amendments, that the IRS was unlikely to approve the creation of a suspense fund that would be used only for 1986 participants, because it might be considered discriminatory in favor of one group of employees, and thus might violate I.R.C. § 401(a)(4), 26 U.S.C. § 401(a)(4).  *See supra* note 6.  Based on the record, then, it appears that the IRS might not have approved a suspense fund created under Plan § 4.3.

it -- know "[a]ll the information necessary to make allocations under the Plan's formula".  Instead, Rexene lacked two crucial pieces of information:  the stock value, and whether, if that value was too great to be allocated under the Plan, the IRS would approve the creation of a suspense fund to benefit *only* the 1986 participants.  Under these circumstances, the allocation process was not merely "ministerial"; a full allocation simultaneously with the contribution, or automatically thereafter, would have disqualified the Plan.  In sum, the finding that the contribution accrued when contributed was clearly erroneous.

b.

Plaintiffs assert, as an alternative to the contribution accruing when contributed, that it accrued when Rexene posted a series of bulletin board notices regarding the allocation.  They contend that these notices effected a "de facto" allocation.[20]  We construe this claim -- made without citation to any authority -- as a form of estoppel, *i.e.* that plaintiffs relied on the notices to calculate the amount that they expected to be allocated, and that they therefore are entitled to it.

ERISA disfavors generally arguments based on promissory estoppel or on alleged modifications of plan documents that are not made via the plan's internal amendment process.  *See **Williams v. Bridgestone/Firestone, Inc.***, 954 F.2d 1070, 1072-73 (5th Cir. 1992) (citing ***Cefalu v. B.F. Goodrich***, 871 F.2d 1290 (5th Cir. 1989)

---

[20]  As noted, Rexene concedes that the bulletin board notices concerning the contribution were intended to help participants calculate the amount that would be allocated to their accounts.

- 23 -

(oral modifications cannot be the basis of a breach of contract claim under ERISA); *Degan v. Ford Motor Co.*, 869 F.2d 889, 895 (5th Cir. 1989); *Rodrigue v. Western & S. Life Ins. Co.*, 948 F.2d 969, 971 (5th Cir. 1991) (plain meaning of plan cannot be altered based on equitable estoppel argument)); *Meadows ex rel. Meadows v. Cagle's, Inc.*, 954 F.2d 686, 690-91 (11th Cir. 1992) (citing cases); *Musto v. American Gen. Corp.*, 861 F.2d 897, 910 (6th Cir. 1988), *cert. denied*, 490 U.S. 1020 (1989). In most cases, however, plaintiffs have attempted unsuccessfully to base estoppel on alleged oral modifications of the plan. Here, plaintiffs rely on written notices, which purported to describe the allocation they would receive. Assuming *arguendo* that an estoppel argument based on these documents could succeed, we turn to the notices.

The first two informed participants of the contribution, its appraised value, and the approximate amount they could expect to receive on allocation. But, they were posted before Rexene's accountants informed it that the contribution, valued at $76.34, was an overcontribution. Had the approximate allocation of one share per $303.00 of earnings been followed, the Plan would have exceeded § 415 limitations.[21] Plaintiffs cannot base a "*de facto* allocation" argument on a strategy which, if followed, would have resulted in Plan disqualification.

Nor do the later notices provide a foundation for a *de facto* allocation. After Rexene learned of the problem, it continued to

---

[21] As stated, this is true regardless of which valuation is used. Even at the lower $76.34 valuation, only some 80,000 shares could have been allocated without exceeding § 415 limitations.

post notices.  A July 30, 1987, notice advised that Rexene had

undertaken a complete review of the Plan and the Savings Plan as a

result of the increased valuation, delaying the production of

account statements.[22]  Another notice, dated that same day, advised

---

[22]    The notice stated:

July 30, 1987

BULLETIN BOARD NOTICE

TO:   ALL STOCK BONUS PLAN PARTICIPANTS

Because of the unexpected higher appraisal value on our company stock, we have undertaken a very complete review of the impact of this bonus and the IRS regulations as they apply to our employees.  Section 415 of the IRS Code requires the company to add together the company contribution to the Stock Bonus Plan, the Savings Plan and the employee's contribution to the Savings Plan in determining the maximum amount that can be granted to any employee.  The total cannot exceed 25% of the employee's compensation.

This review has caused an unforeseen delay in the production of the individual employee Stock Bonus statements, but was absolutely necessary to ensure that both the Savings and Stock Bonus Plans maintain their IRS-approved tax-deferred status.

The company will contribute the 101,794 shares of stock as previously announced.  When the company announced it would contribute the 101,794 shares, it was not known what value would be placed on the shares by the independent appraisal.  The appraised value of the shares was substantially higher than the value projected at the time of announcement.  This higher-than-expected value ($76.34) of the shares will impact our Savings Plan for 1987, particularly in view of the anticipated dollar-for-dollar matching in the Savings Plan.  It appears that we will have to temporarily halt contributions to the Savings Plan until we are able to calculate the 1987 impact of company contributions on each plan participant individually.  The IRS regulations require us as a company to keep plan participants in compliance with the Section 415 limits.

- 25 -

that Rexene hoped to distribute individual account statements within the next ten days.  Later notices advised that it was not possible under § 415 to allocate the entire 1986 contribution for 1986; that the Board had decided to allocate shares up to the § 415 limits of those employees who had contributed the greatest percentage to the Savings Plan; that Rexene had applied to the IRS for approval of Plan amendments; and that the stock had been re-appraised at $158.37 per share.

Plaintiffs could not have relied on these notices for the proposition that their accounts had already been allocated a portion of the 1986 contribution.  The notices do not constitute a *de facto* allocation.  And, because the 1986 contribution did not accrue until actually allocated, after the Plan amendments, those amendments cannot have violated § 1054(g).  "`ERISA simply does not prohibit a company from eliminating previously offered benefits that are neither vested nor accrued.'" ***Wise v. El Paso Natural Gas Co.***, 986 F.2d 929, 935 (5th Cir.) (quoting ***Phillips v. Amoco Oil Co.***, 799 F.2d 1464, 1471 (11th Cir. 1986), *cert. denied*, 481 U.S. 1016 (1987)), *cert. denied*, ___ U.S. ___, 114 S. Ct. 196 (1993); *accord*, ***Bass v. Retirement Plan of Conoco, Inc.***, 676 F. Supp. 735, 745 (W.D. La. 1988).

---

We regret the disappointment that this announcement may cause, but please be assured that we are contributing the maximum number of shares and maximum dollars permitted under our federally-qualified plans.  We must follow the IRS regulations to the letter of the law to maintain the tax-deferred status of our plans.

- 26 -

2.

Concerning valuation, Plan §§ 4.2, 4.4 require that a contribution be valued as of the date it is contributed to the Plan. The district court found that "the Trustee was deemed for purposes of the Plan to have received the contribution as of December 31, 1986. The actual date of contribution was no later than March 2, 1987." And, it found that "[f]or valuation purposes, the date of contribution ... was December 31, 1986. The appraised value of the 101,794 shares was $76.34 per share as of December 31, 1986."[23]

The Rexene defendants counter that the stock was properly valued at $158.37 per share, as of May 1987. Rexene contends that the Plan mandates valuation as of the *actual* date of contribution, despite the fact that, for tax purposes only, Plan § 3.3 allows a contribution made after the end of the calendar year to be treated as if contributed on the last day of that year.

As discussed, the Plan gives Rexene discretion to interpret its terms. Unlike the purely legal question of when benefits accrued, Rexene's decisions regarding the date(s) of contribution and valuation were Plan interpretations, specifically, of § 3.3. Those interpretations conflict with the district court's. Nonetheless, they were made by Rexene in the course of its discretionary functions, allocated to it by the Plan; accordingly,

---

[23] The district court concluded also that the value remained $76.34 per share on February 26, 1987 (when the Board of Directors voted on the 1986 contribution), and on March 2, 1987 (when the stock certificate was issued).

as discussed, we review them only for abuse of that discretion. *Bruch*, 489 U.S. at 115.  To the extent that the district court based its findings of fact on a *de novo* review, those findings are predicated on an erroneous standard of review; and, as a result, we cannot give them deference.[24]

Accordingly, we review only for abuse of discretion Rexene's decisions regarding the dates on which the 1986 contribution was contributed and valued.  As noted, in reviewing a decision under that standard,

> [f]irst, the court must determine the [legally] correct interpretation of the Plan's provisions. Second, the court must determine whether the Plan administrators acted arbitrarily or capriciously in light of the interpretation they gave the Plan in the particular instance.

*Batchelor v. Int'l Bhd. of Elec. Workers Local 861 Pension & Retirement Fund*, 877 F.2d 441, 444 (5th Cir. 1989) (brackets in *Batchelor*).  If the Plan interpretation was legally correct, the

---

[24]    Plaintiffs contend that the Rexene defendants have waived the more deferential standard of review.  But, a standard of review cannot be waived.  *See* **United States v. Vontsteen**, 950 F.2d 1086, 1091-92 (5th Cir.) (en banc) (failing to bring proper standard of review to court's attention until appellate oral argument is "unfortunate, but not fatal"), *cert. denied*, ___ U.S. ___, 112 S. Ct. 3039 (1992).  "The parties' failure to brief and argue properly the appropriate standard may lead the court to choose the wrong standard....  If neither party suggests the appropriate standard, the reviewing court must determine the proper standard on its own". *Id.* at 1091 (citations omitted).

Certainly, it would have been preferable -- and indeed, might have obviated the need for this appeal -- if the Rexene defendants had presented the proper standard of review to the district court, either as part of the pretrial order, or at some other point in the proceedings.  Rexene's not having done so at an earlier stage, however, does not excuse us from applying the proper standard now.

court need not proceed to the second step.[25] *E.g.*, **Duhon v. Texaco, Inc.**, 15 F.3d 1302, 1306-08 & n.3 (5th Cir. 1994); **Wildbur v. Arco Chem. Co.**, 974 F.2d 631, 637 (5th Cir.), *modified*, 979 F.2d 1013 (5th Cir. 1992), *appeal after remand*, No. 93-5069 (5th Cir. argued May 5, 1994); **Jordan v. Cameron Iron Works, Inc.**, 900 F.2d 53, 56 (5th Cir.) (citing **Batchelor**, 877 F.2d at 444), *cert. denied*, 488 U.S. 939 (1990).

In determining the legally correct interpretation of the Plan's contribution and valuation provisions, we are guided by the three-factor test set out in **Dennard v. Richards Group, Inc.**, 681 F.2d 306, 314 (5th Cir. 1982), *cited and quoted in* **Batchelor**, 877 F.2d at 444. We consider "(1) `uniformity of construction [*i.e.*, previous construction of the same provisions]; (2) fair reading and reasonableness of that reading; and (3) unanticipated costs'" to the plan under a particular interpretation. **Batchelor**, 877 F.2d at 444 (quoting **Dennard**, 681 F.2d at 314); *see also* **Duhon**, 15 F.3d at 1307-08 & n.3 (court may, but is not required to, follow **Dennard** test in evaluating interpretation for abuse of discretion); *cf.* **Wildbur**, 974 F.2d 631 (remanding for district court to explain its reasoning according to **Dennard** test).

a.

Plan § 3.3 provides that a contribution by Rexene after the last day of its taxable year (December 31) but prior to filing its tax return for that year,

---

[25]    Because we conclude that Rexene's interpretation was legally correct, we do not reach the second step of the test.

shall, for purposes of the Plan[,] be treated as if it had been received by the [Bank] on the last day of such taxable year if (1) [Rexene designates the payment as being] on account of such taxable year, or (2) [Rexene] claims such Contribution as a deduction on its tax return for such taxable year.

This provision follows the language of I.R.C. § 404(a)(6), 26 U.S.C. § 404(a)(6), which provides that for purposes of *deductibility* of ERISA contributions, the contributor

shall be deemed to have made a payment on the last day of the preceding taxable year if the payment is on account of such taxable year and is made not later than the time prescribed by law for filing the return for such taxable year (including extensions thereof).

26 U.S.C. § 404(a)(6). (Rexene's 1986 tax return was filed September 14, 1987, pursuant to its application for an automatic extension of time until September 15, 1987.) Rexene contends that, under a fair reading of the Plan, this provision and the corresponding Plan § 3.3, do not determine the date of contribution for *valuation* purposes. Instead, it maintains that these provisions determine the contribution date *only* for purposes of determining the taxable year to which it is attributable.

Rexene asserts that, on the other hand, the date for *valuation* purposes is the date the shares were actually contributed to the Plan. In support, it cites Revenue Ruling 73-583, in which an ERISA plan sponsor claimed a deduction based on a $50 per share value of the stock it contributed to the plan. The contribution, pursuant to § 404(a)(6), was deemed for tax purposes to have been made on the last day of the company's taxable year, although it was not actually contributed until the next year. On the company's

books, the contribution was entered as a liability as of the last day of the taxable year. By the time the contribution was actually made, however, the value had declined to $35 per share.

The IRS determined that the company was entitled to a deduction only of $35, not $50, per share. It stated: "the value of the stock at the time the liability was incurred has no bearing on the amount of the employer's deduction in this case". The proper valuation was the value on the date of actual contribution, "not the value at the time the liability to make a contribution was accrued on the employer's books." Rev. Rul. 73-583, 1973-2 C.B. 146. Similarly, Treasury Regulation § 1.415-6(b)(4), dealing with valuation of contributions for purposes of determining § 415 limitations, requires valuation as of the date of contribution, rather than as of the date a deduction is claimed for that contribution. Treas. Reg. § 1.415-6(b)(4) (as amended in 1992).

Because the Plan was in only its second year when the contribution for 1986 was made, there is little guidance with regard to a "uniform construction" of the Plan. As noted, the contribution for 1985 -- the first made -- was appraised as of December 31, 1985, and valued at $1.00 per share.

While instructive, the 1985 appraisal date does not control the date of contribution for valuation purposes for the 1986 contribution. The date used for 1985 was erroneous; according to outside counsel's testimony, the IRS's position was consistently that stock should be valued as of the date it was delivered to the trustee. Thus, using December 31, 1985, as the valuation date for

the *1985* contribution was improper.  In any event, in 1985, such an error was immaterial.  As several witnesses testified, Rexene was unconcerned with the exact value of the 1985 contribution; because the share value remained constant at around $1.00, it was irrelevant whether the stock was valued as of December 31, 1985, or as of February 1986.  But, the contribution for 1986 appreciated rapidly between the first (December 31, 1986) and second (May 31, 1987) appraisal dates.  The valuation date was crucial; and when Rexene realized it initially had made the same mistake (using the wrong valuation date) in valuing the contribution for 1986 as it had done for 1985, it moved to correct its error.

The second **Dennard** factor is a "fair reading" of the Plan, *i.e.*, an interpretation of its plain language.  *See* **Batchelor**, 877 F.2d at 444.  A fair reading of the Plan indicates that § 3.3 is concerned with the contribution date only for purposes of applying the contribution to a particular taxable year.  For valuation purposes, other provisions define when a contribution is made.

Plan § 1.6 defines "Contribution" as "the total amount which [Rexene] *pays* to the [Bank] ..."; §§ 4.2 and 4.4 provide that the cost to Rexene and the valuation of contributed shares shall be computed at "Market Value as of date of contribution".  Because a contribution is defined in terms of payment of shares to the trustee, rather than in terms of the amount claimed as a deduction, it seems consistent to value the contribution as of date of payment, rather than as of the last day of the preceding taxable year.

- 32 -

Finally, **Dennard** cautions considering any unanticipated costs to the Plan which would result from the administrator's interpretations. **Batchelor**, 877 F.2d at 444. If an interpretation would result in "`substantial unanticipated costs to the Plan'", it is less likely to be legally correct. **Id.** at 445 (quoting **Lowry v. Bankers Life & Cas. Retirement Plan**, 865 F.2d 692 (5th Cir.), *cert. denied*, 493 U.S. 852 (1989)). It is unclear whether Rexene's interpretation would have resulted in such costs. What is clear is that Rexene was attempting to *avoid* the substantial unanticipated costs to participants that would have resulted if the Plan had been disqualified. That is, had the stock been allocated at a value of $76.34, and that value later had been determined by the IRS to be erroneous -- with the result that the Plan was disqualified (because, at the correct, higher valuation, *e.g.*, $158.37, the Plan would have far exceeded its § 415 limit) -- the participants would have had stock in the company, and corresponding tax liability, but no corresponding income to pay it.[26]

---

[26] As Rexene's expert witness testified, disqualification is a particular problem

> [i]n a stock bonus plan like this, [where] you have a company that is closely held, the participants can't do anything with the stock, yet the stock has value. If the plan is disqualified, the participants now get this block of stock that may be worth thousands of dollars. They can't sell it. They now have income on their tax return, they have no money to pay their taxes. And at the same time, unless the plan is terminated, they won't even receive the shares of stock until the plan is terminated. So they lose their retirement, they get a tax impact, they don't have any money to pay the tax, the company may or may not lose the deduction,.... [I]t is a catastrophic problem.

In sum, we conclude that the correct legal interpretation of the Plan's relevant language is essentially as presented by Rexene, *i.e.*, that the date of actual contribution should control valuation, regardless of when, as provided by § 3.3, it may have been claimed as a tax deduction.[27]

b.

We turn next to the proper appraisal *value* of the shares. By advising a re-appraisal as of May 1987, outside counsel was attempting to avoid a problem similar to that covered by Rev. Rul. 73-583, 1973-2 C.B. 146, discussed *supra*. As plaintiffs point out, outside counsel had advised Rexene to use the earliest possible date of contribution (February 26, 1987) when discussing amendments to the Plan with the IRS. In discussions with the IRS and in the amendments submitted to it, Rexene had designated the date of contribution as February 26, 1987 (the date the Board authorized the contribution). Outside counsel testified that he advised Rexene to use this date when discussing possible amendments to the Plan, because it was the earliest possible contribution date. Any Plan amendment that resulted in a reversion of shares to the Plan (as contemplated by the Second Amendment) would have had to be made within a year of the date of contribution. Thus, by choosing the earliest possible contribution date in communications with the IRS, outside counsel was "[taking] the most conservative point of view

---

[27] As noted, Rexene claimed a deduction of $1,952,777 for contributions to the Plan in fiscal year 1986; this corresponds to a contribution of 25,580 shares valued at $76.34 per share.

- 34 -

[with regard to the deadline for any amendment to the Plan], which was the date that [the contribution] was first authorized".

Outside counsel testified, however, that at some point between the submission of the Second Amendment to the IRS and the passage of the Fourth (*i.e.*, in late 1987 or early 1988), he realized that the value might have increased rapidly so that the $76.34 appraisal would no longer be accurate. Out of concern that Rexene might be audited, outside counsel "hit the books" in an attempt to determine the correct valuation date.

With regard to the proper valuation date, outside counsel testified that both he and the IRS "on all fronts said the same thing ... a contribution is [valued] on the date that you actually give it to the trustee, and that was the position they took." In determining the date for *valuation* purposes, then, outside counsel attempted to use the latest possible one -- May 1987 -- again out of concern for what the IRS might do.[28] Outside counsel testified that, although Rexene executives would have preferred to use the $76.34 valuation, he advised using $158.37, because "if they had made the other choice, they may very well have disqualified the plan." Outside counsel explained that, using $76.34, more shares could have been allocated than using $158.37. If the lower valuation were used, and the IRS had audited the Plan (which outside counsel testified he "felt certain" would occur) and

_____

[28] At oral argument, Rexene's counsel stated that the re-appraisal was commissioned as of May 31, instead of May 13, 1987, because it was necessary to have a "cut-off" date for bookkeeping purposes.

determined that the $158.37 was correct, the change in valuation "would have busted [the § 415 limit]".  Because an audit would likely have come after the one-year deadline for amendments, "[w]e would have had no chance to amend or do anything else" to correct the problem, and the Plan would have been disqualified.

In short, the decision to re-appraise the stock as of the date of its delivery to the trustee was a considered decision, which Rexene made on the advice of counsel, and out of concern that the Plan would be disqualified if an earlier valuation date was used. Because we hold that Rexene's interpretation of the Plan -- that § 3.3 governs the date of contribution only for purposes of deductibility, and that the contribution otherwise is valued as of the date of actual contribution -- is the correct legal interpretation, we need not reach whether it acted arbitrarily and capriciously in making that interpretation. *Wildbur*, 974 F.2d at 637.  The Rexene defendants did not violate § 1054(g) when they amended the Plan.

3.

Plaintiffs charge also that the Rexene defendants' decisions concerning the Plan constituted a breach of their fiduciary duty, in violation of ERISA § 404, 29 U.S.C. § 1104.[29]  This contention

---

[29]    Although a Plan amendment may be permissible under other applicable sections of ERISA, including 29 U.S.C. § 1054, it also must satisfy ERISA's fiduciary duty requirements, contained in 29 U.S.C. § 1104.

centers on three subsections of § 1104; we need consider only (a)(1)(A).[30]

Plaintiffs contend that by using $158.37, instead of $76.34, the Rexene defendants breached their fiduciary duty under § 1104(a)(1)(A), which requires Plan fiduciaries to

> discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries and ---
>
> > (A)  for the *exclusive purpose* of:
> >
> > > (i)  providing benefits to participants and their beneficiaries; and
> > >
> > > (ii) defraying reasonable expenses of administering the plan[.]

29 U.S.C. § 1104(a)(1) (1988) (emphasis added).  They contend that, by amending the Plan in such a way that 1986 participants received less than 100% of the 1986 contribution, Rexene and the corporation violated their duty to administer the Plan "for the exclusive purpose of ... providing benefits to participants".  *Id.*  In support, plaintiffs make much of Rexene's selling all of its stock in April 1988 -- shortly after the Fourth Amendment to the Plan was approved in February 1988 by the IRS -- and negotiating in preparation for the sale since the fall of 1987.

According to plaintiffs, the Plan amendments were motivated primarily by the impending sale:  because the shares in the suspense account were included in Rexene's value, the greater their

---

[30]    Because we hold that Rexene was not acting as a plan fiduciary when it amended the Plan, and therefore that it cannot have violated § 1104, we need not consider §§ 1104(a)(1)(B) (failure to manage the plan with the requisite care, skill and prudence), 1104(a)(1)(D) (failure to follow plan documents).

value, the greater the company's value, and the larger the deduction a buyer could take for the shares. Thus, plaintiffs contend, Rexene had an incentive to re-value the shares at as high a value as possible, and to ensure that as few shares as possible were allocated to participants in advance of the sale. The district court agreed, finding that the decisions with regard to the Plan were made "because of the Company's concern for the Savings Plan contributions [*i.e.*, for the heavy savers] and the imminent sale." This motivation is the cornerstone of the district court's conclusion that the Rexene defendants were acting in Rexene's self-interest, rather than as fiduciaries of the Plan for its benefit and that of the participants.

Rexene's witnesses testified that Rexene acted only to ensure that the contribution was allocated in a fashion that did not cause the Plan to be disqualified, and did not penalize the heavy savers. But, we give special deference to the district court's assessment of the witnesses' credibility, and must defer to its assessment of the evidence, if it is

> plausible in light of the record viewed in its entirety ... even though convinced that had [we] been sitting as the trier of fact, [we] would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

***Anderson v. City of Bessemer City***, 470 U.S. at 574.

Accordingly, we accept the district court's findings with regard to the motivation of Rexene and the Administrative Committee. With this in mind, we turn to § 1104(a)(1).

- 38 -

a.

Section 1104 mandates that a plan be administered "solely in the interest of the *participants and beneficiaries*".  29 U.S.C. § 1104(a)(1) (emphasis added).  Plaintiffs read this to require Rexene to manage the Plan solely in the interest of *1986 Plan participants and their beneficiaries*.  But, a fiduciary's duty "runs to the plan as a whole," not to any individual beneficiary or group of beneficiaries.  *Williams v. Caterpillar, Inc.*, 944 F.2d 658, 665 (9th Cir. 1991).  Plaintiffs' concern, at bottom, is that the entire 101,794-share 1986 contribution was not allocated to them; and while it is true that *1986 participants* received only the equivalent of 82,248 shares, this does not mean, *ipso facto*, that the Rexene defendants failed to administer the Plan for the benefit of *all* its participants and their beneficiaries.[31]  Indeed, as in *Williams*, plaintiffs do not assert that the challenged actions "were detrimental to all claimants under ... the plan[] in question; they have sued only on their own behalf."  *Id.*  In sum, the record supports a conclusion that, in addition to the motivation found by the district court, the Rexene defendants acted out of concern for the long-term viability of the Plan, including its continued status as an ERISA-qualified plan.

---

[31]    *But see **Deak v. Masters, Mates & Pilots Pension Plan***, 821 F.2d 572, 578-79, 581 (11th Cir. 1987) (finding amendment to Plan that benefitted certain participants at expense of others, to be arbitrary and capricious, and breach of fiduciary duty under ERISA, even though, if adopted "absent from or insulated from any conflicts of interest," same amendment might not violate ERISA), *cert. denied*, 484 U.S. 1005 (1988).

Moreover, even if Rexene's decisions with regard to the Plan were made with the primary motive of benefitting Rexene, those decisions had the secondary purpose of benefitting (or at least, not harming) the Plan as a whole. In this situation, we are faced with two lines of authority.

The first counsels that such an incidental benefit cannot "legitimize" a fiduciary's improper (self-interested) motives. *Deak v. Masters, Mates & Pilots Pension Plan*, 821 F.2d 572, 579-81 & n.12 (11th Cir. 1987), *cert. denied*, 484 U.S. 1005 (1988). In *Deak*, the plaintiff was a participant in an ERISA plan administered by employees of the Union that had created it. *Id.* at 597-98. The administrators' decision to amend the plan was, at least in part, motivated by a desire to benefit the Union, rather than, as ERISA commands, *solely* the plan participants and beneficiaries. In analyzing the decision, the court stated:

> It is difficult to conceive of a situation where a benefit to the Union would not have incidental benefit to the Plan.... However, the statute requires the Trustees to act *for the sole benefit of the Plan beneficiaries. The District Court was entitled to find from the evidence at trial that the actions of the Trustees were for the benefit of the Union. The benefit to the Plan cannot legitimize their motives*, especially in light of the findings of fact that the Plan was underfinanced at the time and that the Trustees made no actuarial investigation of [the amendment].

*Id.* at 580 n.12 (emphasis added). Quoting *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir.), *cert. denied*, 459 U.S. 1069 (1982), the *Deak* court noted that "`officers of a corporation who are Trustees of its pension plan ... must [act] with an eye single to

the interest of the participants and beneficiaries.'" *Id.* at 580 (citation omitted).

As noted, the district court found that Rexene acted, at best, with a dual motivation: to avoid the Plan being disqualified and heavy savers being penalized on the one hand, and on the other, to facilitate the impending sale. Under the reasoning in *Deak*, 821 F.2d at 578-81, then, Rexene's decision to amend the Plan would be a breach of fiduciary duty under § 1104(a)(1)(A), because -- in the view of the district court -- it was not enacted primarily, or solely, for the benefit of the participants.

Another line of cases weighs in favor of the opposite result. It provides that, when an employer is also a fiduciary for its ERISA plans, it acts as a fiduciary "only when and to the extent that [it] function[s] in [its] capacity as plan administrator[], not when [it] conduct[s] business that is not regulated by ERISA." *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1158 (3d Cir. 1990) (internal quotation marks and citations omitted); *accord*, *McGath v. Auto-Body North Shore, Inc.*, 7 F.3d 665, 670 (7th Cir. 1993) (citing *Hozier*). Business not regulated by ERISA has been widely held to include decisions *to amend or terminate ERISA plans*; as part of a balance between the employer's need to manage its business and Congress's "desire to regulate" ERISA plans, an employer is given broader discretion to act with regard to a plan when it does so as employer, instead of as fiduciary. *See Hozier*, 908 F.2d at 1159-60 (discussing policy rationale for distinction between actions available to employer-as-employer and employer-as-

fiduciary); *cf.* **McGann v. H&H Music Co.**, 946 F.2d 401, 407 (5th Cir. 1991) (non-fiduciary issue; Congress intended "that employers remain free to create, modify and terminate the terms and conditions of employee benefit plans without governmental interference."), *cert. denied*, ___ U.S. ___, 113 S. Ct. 482 (1992); **Wise v. El Paso Natural Gas**, 986 F.2d at 937 (employer generally may modify or discontinue non-vested benefits without violating ERISA). "An employer can wear two hats:  one as a fiduciary administering a pension plan and the other as the drafter of a plan's terms....  [A]n employer does not act as a fiduciary when it amends or otherwise sets the terms of a plan." **McGath**, 7 F.3d at 670-71 (citing cases, including **Jos. Schlitz Brewing Co. v. Milwaukee Brewery Workers' Pension Plan**, 3 F.3d 994 at 1001, 1002 (7th Cir. 1993), *petition for cert. filed*, 62 U.S.L.W. 3378 (U.S. Nov. 12, 1993) (No. 93-768)).

Of course, an employer does not have "unfettered discretion to amend or terminate plans at will", **Hozier**, 908 F.2d at 1162; "ERISA's detailed accrual and vesting provisions substantially limit this power", as do the terms of the plan documents, collective bargaining agreements, and other ERISA provisions relating to the form of amendments. **Id.** But, in general, an employer that decides to terminate, amend, or renegotiate a plan does not act as a fiduciary, *and thus cannot violate its fiduciary duty*, provided that the benefits reduced or eliminated are not accrued or vested at the time, and that the amendment does not

- 42 -

otherwise violate ERISA or the express terms of the plan.[32] *See* *id.* at 1160-61.

A majority of the circuits have followed this approach; we consider it the sound one, as did the Third Circuit in *Hozier*. *Id.* (citing cases); *see also McGann*, 946 F.2d at 407 & n.9 (citing language from *Musto*, 861 F.2d at 911, which notes that a company acts as fiduciary when administering plan, but not when deciding plan's terms).[33] Accordingly, we bring our circuit into line with the majority, adopting the reasoning that, in amending the Plan as it did, Rexene was not acting as fiduciary, but as employer. Accordingly, it did not breach a § 1104 fiduciary duty.[34]

---

[32] As discussed, plaintiffs had no accrued or vested interest in the 1986 contribution when the Plan was amended; and, as stated, "ERISA simply does not prevent a company from eliminating previously offered benefits that are neither vested nor accrued." *Phillips*, 799 F.2d at 1471.

[33] *Hozier*'s list of decisions in accord includes *Musto*, 861 F.2d at 912 (6th Cir. 1988); *Young v. Standard Oil (Indiana)*, 849 F.2d 1039, 1045 (7th Cir. 1988), *cert. denied*, 488 U.S. 981 (1989); *Anderson v. John Morrell & Co.*, 830 F.2d 872, 876 (8th Cir. 1987); *Cunha v. Ward Foods, Inc.*, 804 F.2d 1418, 1432-33 (9th Cir. 1986) (employer not acting as fiduciary when it made "business decision" to terminate plan); *Phillips v. Amoco*, 799 F.2d at 1471 (11th Cir. 1986); *Amato v. Western Union Int'l*, 773 F.2d 1402, 1417 (2d Cir. 1985) (officers acted on behalf of corporation, rather than as fiduciaries, when amending corporate pension plan), *cert. dismissed*, 474 U.S. 1113 (1986); and *Sutton v. Weirton Steel Div. of Nat'l Steel Corp.*, 724 F.2d 406, 411 (4th Cir. 1983), *cert. denied*, 467 U.S. 1205 (1984) (employer's decision "to renegotiate or amend" unfunded benefits was not fiduciary action). Further, *Hozier* states that "[w]e know of no decision by any court of appeals to the contrary." 908 F.2d at 1161.

[34] Because we reverse the district court on the §§ 1054(g) and 1104 claims, we need not reach the following issues: (1) the Rexene defendants' assertion that most of the plaintiffs are barred from pursuing claims against them, because of a settlement in a prior state action against Rexene's predecessor; (2) plaintiffs' challenge to the credit granted the Rexene defendants for the

B.

Finally, the Bank appeals from the denial of its attorney's fees motion. We review the denial only for abuse of discretion,

---

portions of the 1986 contribution allocated to 1986 participants in plan years 1987-1991; and (3) as discussed below, plaintiffs' cross-appeal from the Bank's judgment as a matter of law.

Plaintiffs' cross-appeal concerns claims under 29 U.S.C. §§ 1104 and 1105 (fiduciary and co-fiduciary liability). Because there was no breach of fiduciary duty on the part of the Rexene defendants, it goes without saying that the Bank cannot be liable as a co-fiduciary for the same conduct. Accordingly, we need not address the § 1105 claims.

With regard to § 1104, the district court found correctly that the Bank was a directed custodial trustee, with no

> right, power, or duty to determine how the [Plan] assets would be allocated.... Further, the Bank did not possess information necessary to make allocation determinations and did not have access to the information or any right to use the information ... [or to play] any role in the allocation process.

The Bank was a fiduciary "only with respect to those aspects of the plan over which [it] exercise[d] authority or control." *Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enters., Inc.*, 793 F.2d 1456, 1459-60 (5th Cir 1986) (citing *Brandt v. Grounds*, 687 F.2d 895, 897 (7th Cir. 1982), *cert. denied*, 479 U.S. 1034 (1987)); ERISA § 2(21)(a), 29 U.S.C. § 1002(21)(A). It is undisputed that, by the Plan's plain terms, the Bank had no duty, discretion, or responsibility to value or allocate contributions or amend the Plan. Under the Plan, the Bank's only duties were custodial: to hold, preserve, and invest the assets of the Plan, subject to directions from Rexene. A breach of the Bank's fiduciary duty, then, could occur only if the Bank breached those duties. *See Sommers Drug*, 793 F.2d at 1459-60; *Brandt*, 687 F.2d at 897.

Plaintiffs stipulated that the Bank did not improperly invest the assets. They contend, nevertheless, that it breached its duty to hold and preserve the assets by consenting to the Second and Fourth Amendments, on the basis that the amendments had the effect of decreasing the assets' value. Again, we need not address this argument, because we hold that the amendments did not violate ERISA.

- 44 -

pursuant to ERISA § 502, 29 U.S.C. § 1132(g)(1), which provides that "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party."  *See also* **Salley**, 966 F.2d at 1017 (attorney's fees awards under ERISA are reviewed for abuse of discretion).

The Bank contends, essentially, that it is entitled to the fees because -- as evidenced by the judgment in its favor -- plaintiffs' claims against it were "not substantially justified". The Bank relies heavily on the "degree of the opposing parties' ... bad faith", the first of the five factors this court uses to rule on fees under ERISA.  *Iron Workers Local No. 272 v. Bowen*, 624 F.2d 1255, 1266 (5th Cir. 1980).[35]  Despite granting the Bank judgment as a matter of law, the district court found that

> [p]laintiffs' case *was not brought in bad faith*, the case was sufficient to withstand [the Bank's] Motion for Summary Judgment, and [the Bank's] being granted a Judgment as a Matter of Law fails to

---

[35]    The **Bowen** factors are:

> (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions.  No one of these factors is necessarily decisive, and some may not be apropos in a given case, but together they are the nuclei of concerns that a court should address in applying [ERISA] section 502(g) [29 U.S.C. § 1132(g)].

**Bowen**, 624 F.2d at 1266, *quoted in* **Harms**, 984 F.2d at 694.

support any claim that Plaintiffs' claim was groundless. (Emphasis added.)

Nor do the remaining **Bowen** factors aid the Bank. Especially because we reverse the judgment awarded plaintiffs, it is not clear that, under the second factor, they would be able to satisfy a fees award. And, there is no evidence that, pursuant to the fourth factor, the Bank sought (by its actions in *defending* this suit) to benefit the participants or beneficiaries of the Plan or that it sought to resolve an important question under ERISA. Moreover, in light of the district court finding that plaintiffs' claim against the Bank was not meritless or groundless, we cannot say that the "relative merits" of the parties' positions assist the Bank, per the fifth factor; nor that there is a particular need for deterrence under the third. As this court stated in **Harms**, 984 F.2d at 694, "we believe the absence of any culpability or bad faith on the defendants' part ... coupled with the closeness of the legal issues presented ... supports our conclusion" that the district court did not abuse its discretion in denying the Bank's motion for attorney's fees.[36]

## III.

For the foregoing reasons, we **REVERSE** the judgment against the Rexene defendants; as to Texas Commerce Bank, we **AFFIRM** the judgment that it is not liable and that it is not entitled to attorney's fees.

**AFFIRMED in PART; REVERSED in PART**

---

[36]   This is especially true given that Rexene has agreed to reimburse some part of the Bank's costs in this suit.